UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---------------------------------------------------------x
                :

BlueMountain Capital Management, LLC, for   :
and on behalf of investment funds for which it   :
acts as investment manager,   :
                :

          Plaintiff,   :
                :

     -against-   :
                :

Alejandro J. García Padilla, in his official   :    No. 14-1569
capacity as Governor of Puerto Rico; César R.   :
Miranda Rodríguez, in his official capacity as   :
Secretary of Justice of Puerto Rico; and John   :
Doe, in his official capacity as employee or   :
agent of the Government Development Bank   :
for Puerto Rico,   :
                :

         Defendants.   :
---------------------------------------------------------x

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

INDIANO & WILLIAMS, PSC
DAVID C. INDIANO
JEFFREY M. WILLIAMS
LETICIA CASALDUC-RABELL
USDC-PR Nos. 200601, 202414, 123513
207 Del Parque St., 3d Floor
San Juan, P.R.  00912
Telephone:   787.641.4545
Facsimile:   787.641.4544

– and –

GIBSON, DUNN & CRUTCHER LLP
THEODORE B. OLSON
MATTHEW D. MCGILL
MATTHEW J. WILLIAMS
SCOTT G. STEWART
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:   202.955.8500
Facsimile:   202.467.0539

Attorneys for Plaintiff

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff BlueMountain Capital Management, LLC, for and on behalf of investment funds for which it acts as investment manager, hereby sues defendants Alejandro J. García Padilla in his official capacity as Puerto Rico Governor, César R. Miranda Rodríguez in his official capacity as Puerto Rico Secretary of Justice, and John Doe in his official capacity as agent of the Government Development Bank for Puerto Rico.  Plaintiff alleges and prays as follows:

**INTRODUCTION**

1.      This is an action under the United States Constitution, 42 U.S.C. § 1983, and the Puerto Rico Constitution challenging the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the "Act"), a statute enacted by the Commonwealth of Puerto Rico that creates an unlawful bankruptcy regime and unlawfully impairs the obligation of contracts.

2.      The United States Constitution and federal law preclude the Commonwealth from enacting a bankruptcy law that adjusts the debts of its instrumentalities and public entities and binds non-consenting creditors.  The United States Congress has enacted a federal Bankruptcy Code, expressly provided that States have no power to enact their own laws for adjusting debts, *see* 11 U.S.C. § 903, and excluded Puerto Rico's instrumentalities from participating in the federal bankruptcy system, *see* 11 U.S.C. §§ 101(40), (52), 109(c).

3.      The United States Constitution and Puerto Rico Constitution also prohibit the Commonwealth from enacting a law that substantially impairs the obligation of contracts in a way that is not reasonable and necessary to promote public welfare.  *See* U.S. Const. art. I, § 10; P.R. Const. art. II, § 7.

4.      Despite those prohibitions, in June 2014 the Commonwealth enacted the Act, which (a) establishes a bankruptcy system that purports to provide for the adjustment of debts

owed by Puerto Rico's instrumentalities and public entities and to bind non-consenting creditors, and (b) substantially, unreasonably, and unnecessarily impairs the obligation of contracts.

5.     The Act violates the United States Constitution, federal law, and the Puerto Rico Constitution, and is invalid in its entirety.  The Act has harmed Plaintiff and, if allowed to stand, would further harm Plaintiff.  Plaintiff accordingly seeks a declaration that the Act violates the United States Constitution, federal law, and the Puerto Rico Constitution, and an injunction prohibiting the defendants from enforcing the Act.

## PARTIES

6.     Plaintiff BlueMountain Capital Management, LLC is a limited liability company organized under the laws of Delaware that maintains its principal place of business in New York. Plaintiff manages funds that, collectively, hold more than $400 million of power revenue bonds (the "PREPA bonds") issued by the Puerto Rico Electric Power Authority ("PREPA") pursuant to the Puerto Rico Electric Power Authority Act.  At least one of the funds that holds PREPA bonds is domiciled in the United States.

7.     Defendant Alejandro J. García Padilla is the Governor of the Commonwealth of Puerto Rico.  Plaintiff sues Governor García Padilla in his official capacity.

8.     Defendant César R. Miranda Rodríguez is the Secretary of Justice of Puerto Rico. Plaintiff sues Secretary Miranda Rodríguez in his official capacity.

9.     Defendant John Doe (the "Development Bank Agent") is an employee or other agent of the Government Development Bank for Puerto Rico (the "Development Bank") who is empowered to authorize or direct a public entity to seek relief under the Act on behalf of the Development Bank.  The Development Bank is a public corporation organized under the laws of the Commonwealth that serves as a bank, fiscal agent, and financial advisor to the

Commonwealth.  The Development Bank is headquartered in the Commonwealth.  Plaintiff sues the Development Bank Agent in his official capacity.

## JURISDICTION AND VENUE

10.     This action arises under the Constitution of the United States, 42 U.S.C. § 1983, and the Puerto Rico Constitution.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367(a).   The Court is authorized to issue the declaratory and injunctive relief sought here under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

11.     As explained below, this dispute is ripe for review by this Court.  The passage of the Act itself significantly depressed the value of the PREPA bonds.  *See infra* ¶ 38.   Moreover, PREPA is highly likely to seek relief under the Act imminently.  *See infra* ¶ 39.  And even if PREPA chose not to seek relief, the Act expressly "annuls" certain of the bondholders' rights, such as the right to seek appointment of a receiver.  *See infra* ¶ 40.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### I.     The PREPA Bonds And PREPA's Contractual Promises

13.     In May 1941, the Commonwealth authorized PREPA to issue bonds through the Puerto Rico Electric Power Authority Act, Act No. 83 (1941).   Through this statute, the Commonwealth expressly "pledge[d] to, and agree[d] with, any person, firm or corporation . . . subscribing to or acquiring bonds of [PREPA] . . . that it w[ould] not limit or alter the rights or powers hereby vested in [PREPA] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  22 L.P.R.A. § 215.   The statute also expressly

confirms that PREPA bondholders have a right to the appointment of a receiver if a default occurs, *see id.* § 207, and to other remedies as well, *see id.* § 208.

14.    PREPA issued the PREPA bonds underlying this lawsuit pursuant to a trust agreement with U.S. Bank National Association as Successor Trustee (the "Trustee"), dated January 1, 1974, as amended and supplemented through August 1, 2011 (the "Trust Agreement") (Ex. A).  The Trust Agreement is incorporated herein by reference.

15.    PREPA promised in the Trust Agreement to promptly pay principal and interest on the PREPA bonds—which are secured by a pledge of PREPA's current and future net revenues from its entire electric generation, transmission, and distribution system, *see, e.g.*, Trust Agreement §§ 701, 705; Power Revenue Bonds, Series 2013A Offering Circular, at 1 (Ex. B)— and to manage its rates in a way that ensures that it will meet its obligations under the PREPA bonds, Trust Agreement § 502.  The Trust Agreement further provides that as long as the PREPA bonds remain outstanding, "no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the bondholders might be impaired or diminished."  *Id.* § 709.  PREPA also promised not to sell, lease, or otherwise dispose of any part of its electric-power system, *id.* § 712; not to create a charge or lien on the revenues securing the PREPA bonds that ranks equally with or prior to bondholders' charge or lien on the revenues of the PREPA bonds issued under the Trust Agreement, *id.*; and not to extend the maturity date of the PREPA bonds, reduce the principal or interest due on the PREPA bonds, or create liens on PREPA's revenues without the consent of the affected bondholder, *id.* § 1102.  PREPA assured bondholders in the Trust Agreement that they could accelerate payments if PREPA defaulted on the PREPA bonds and could sue in equity or at law to enforce the agreement or seek appointment of a receiver.  *See id.* §§ 803, 804.  The Trust Agreement specifies that an event of

default occurs when, among other things, PREPA is "rendered incapable of fulfilling its obligations" under the Trust Agreement, *id.* § 802(c), or when PREPA enters into a proceeding, or an order or decree is entered, for the purpose of effecting composition between PREPA and its creditors or for the purpose of adjusting claims that are payable from the revenues used to satisfy the bond obligations. *Id.* § 802(f), (g). Additionally, PREPA pledged that if it failed to manage its rates as required, the holders of at least 10 percent of the amount of the PREPA bonds could request that the Trustee bring suit to compel PREPA to do so, without regard to whether an event of default occurred. *Id.* § 502.

16.     The offering circular for the Series 2013A Power Revenue Bonds similarly induced investors to invest in the PREPA bonds by touting the Trust Agreement's remedial provisions. *See* Power Revenue Bonds, 2013A Series, App. 1, at I-15 to I-16.

17.     In acquiring the PREPA bonds, bondholders relied on the Commonwealth's promises in the Puerto Rico Electric Power Authority Act and PREPA's promises in the Trust Agreement.

18.     The Trust Agreement is "assumed to incorporate" the Puerto Rico Electric Power Authority Act since the statute was "in place" when the contract was formed. *Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184, 188 (1st Cir. 1997).

19.     The Trust Agreement remained in effect up to the time the Act was passed, and continues in effect today.

## II.     The Act And PREPA's Pending Default

20.     On June 25, 2014, the Commonwealth's Senate (*Senado*) voted to approve the Act.     The following day, the Commonwealth House of Representatives (*Cámara de*

*Representantes*) also voted to approve the Act.  On June 28, 2014, Governor García Padilla signed the Act into law.

21.     The Act purports to offer to certain public entities within the Commonwealth the ability to insulate themselves from their obligations to creditors and to modify debts without the consent of all creditors.  The Act is expressly modeled on Title 11 of the United States Code (the "Bankruptcy Code")—particularly Chapter 9 of that Title—but diverges from the Bankruptcy Code in ways that inure to the detriment of creditors of the Commonwealth's public entities.

22.     Chapter 9 of the Bankruptcy Code, 11 U.S.C. §§ 901 *et seq.*, governs the adjustment of debts of a municipality.  A "municipality" includes an "instrumentality"—such as a public entity.  *Id.* § 101(40).

23.     Chapter 9 contains provisions specific to municipalities and also incorporates provisions from other chapters of the Bankruptcy Code.  *See* 11 U.S.C. § 901.  A municipality seeking to adjust its debts under Chapter 9 must file a plan with a bankruptcy court.  *See id.* § 941.  The bankruptcy court may make the plan binding on creditors by confirming it if, among other requirements, each impaired class of claims accepts the plan.  *See id.* §§ 944(a), 1129(a)(8).  Once holders of at least two-thirds in amount and more than one-half in number of the allowed claims of such a class held by creditors accept the plan, the class is deemed to have accepted the plan and the dissenting creditors are accordingly bound by it.  *Id.* § 1126(c).

24.     The bankruptcy court may also compel non-consenting creditors to be bound by a plan if it meets certain standards of fairness, regardless of the threshold of creditor support.  *See* 11 U.S.C. §§ 944(a), 1129(b)(1), 1129(b)(2)(A)-(B).

25.     To support its debt-reduction regime, Chapter 9 of the Bankruptcy Code incorporates Bankruptcy Code provisions that automatically stay creditors' enforcement efforts during the pendency of bankruptcy proceedings.  *See* 11 U.S.C. §§ 362, 922.

26.     Chapter 9 also incorporates a provision allowing municipalities to obtain credit while an automatic stay is in place.  *See* 11 U.S.C. § 364.  But where obtaining credit would require the debtor to provide senior liens on property or funds that have already been pledged as collateral for preexisting loans, the municipality must provide "adequate protection" to the preexisting creditors' interest.  *See id.* § 364.  Adequate protection includes cash payments, additional or replacement liens, and "such other relief . . . as will result in the realization by [the creditor] of the indubitable equivalent of [the creditor's] interest in" the property.  *Id.* § 361(3).

27.     Chapter 9 further incorporates provisions specifying the circumstances in which certain contracts may be abrogated, 11 U.S.C. § 365, declaring that *ipso facto* clauses—clauses providing for default triggered by a bankruptcy filing or other specified event—are not enforceable, *id.* § 365(e), and providing for the formation of a creditor committee charged with representing creditors' interests during the bankruptcy, *see id.* §§ 1102-1103.

28.     Only a "municipality," as defined by the Bankruptcy Code, may be a debtor under Chapter 9 of the Code.  *See* 11 U.S.C. § 109(c).  While the Code provides that the term "municipality" includes a public agency or instrumentality of a State, *see id.* § 101(40), the Code further provides that "for the purpose of defining who may be a debtor under chapter 9" the term "State" does not include the District of Columbia or Puerto Rico, *see id.* § 101(52).  In this way Congress explicitly excluded municipalities, public agencies, and instrumentalities of Puerto Rico from bankruptcy protection.

29.     The Bankruptcy Code specifically prevents States from exercising any authority to bind non-consenting creditors of municipalities.  *See* 11 U.S.C. § 903.  Because this provision does not involve who may be a debtor under Chapter 9 of the Bankruptcy Code, the term "State" in Section 903 includes Puerto Rico.  *See* 11 U.S.C. § 101(52).  Accordingly, Section 903 of the Code bars Puerto Rico from binding non-consenting creditors of its municipalities just as it bars other States from binding non-consenting creditors of their municipalities.

30.     Although Congress deliberately excluded Puerto Rico municipalities and instrumentalities from eligibility to be a debtor under Chapter 9, and although federal law preempts other bankruptcy protection for municipalities, the Act creates a bankruptcy regime for the Commonwealth's public entities and other municipalities.

31.     The Act creates a "Public Sector Debt Enforcement and Recovery Act Courtroom of the Court of First Instance, San Juan Part," which effectively serves as the Commonwealth's bankruptcy court for certain municipalities and public entities.  *See* Act §§ 102(18), 109.  The court is empowered to conduct proceedings and resolve cases under the Act's chapters, and its determinations are "binding," subject to appeal.  *Id.* §§ 110, 114.

32.     The Act provides two methods for restructuring debt, which are set forth in Chapters 2 and 3 of the Act.   Eligible public entities may seek relief under either or both of those chapters.  Act § 112.

33.     Chapter 2 provides for a partially consensual restructuring procedure similar to the Bankruptcy Code's procedure for confirming a plan with a threshold level of creditor consent.  *See* 11 U.S.C. §§ 944(a), 1129(a)(8).  Under the Act, the Development Bank (and, in certain instances, the Governor) must authorize or direct a public entity to seek relief before the entity may invoke the Act's protections.  *See* Act § 113(a); *id.* § 201(b).  The public entity may

then submit to the court a plan called a "recovery program" containing proposed amendments, modifications, waivers, or exchanges to or of specified debt instruments.  *Id.* § 202(a)-(b).  If creditors of at least 50 percent of the amount of debt of a class participate in a vote to approve the plan, and creditors of at least 75 percent of the amount of debt that participates vote to approve it, then, subject to certain other conditions, the court may issue an order approving the plan.  *See id.* §§ 202(d), 204.  An approval order is treated as a "judgment for the purposes of Commonwealth law, subject only to appeal."  *Id.* § 115(a).

34.     Chapter 3 of the Act provides for a restructuring process to bind entire classes of non-consenting creditors.  A public entity is eligible for relief under Chapter 3 if:  (a) it is insolvent; (b) it is authorized to file a petition "by its governing body and [the Development Bank]," or "a petition is filed on its behalf by [the Development Bank], upon the Governor's request"; and (c) it is "ineligible for relief under title 11 of the United States Code."  Act § 113(b); *see id.* § 301(a).  The Chapter 3 process begins when the public entity files with the court a petition that sets forth the amount and types of claims that will be affected by a restructuring plan.  *See id.* § 301(d).  If the court concludes that the petitioner is eligible for relief under Chapter 3, the petitioner or the Development Bank may then propose a restructuring plan to the court.  *Id.* § 310.  The court may confirm the plan if it meets certain requirements and "at least one class of affected debt has voted to accept the plan by a majority of all votes cast in such class and two-thirds of the aggregate amount of affected debt in such class that is voted."  *Id.* § 315(e); *see id.* §§ 312, 315.  A confirmation order is treated as a judgment.  *See id.* § 115.

35.     Chapters 2 and 3 of the Act provide for a suspension period and automatic stay, respectively, during which creditors are barred from exercising remedies under their contracts against debtors invoking the Act.  *See* Act §§ 201(d), 205, 304.

9

36.     The Act allows public entities to obtain credit during the Chapter 2 suspension period or the Chapter 3 automatic-stay period.  *See* Act §§ 206, 322.  If an entity is unable to obtain unsecured credit, the entity is permitted, with court approval, to obtain credit secured by a lien on the public entity's property, including by a lien of equal or greater seniority to already-existing liens on the same property.  *See id.* § 322(c).  The public entity need not provide adequate protection to the preexisting lienholder if, among other things, the proceeds are "needed to perform public functions."  *Id.* § 322(c)(2)(A).  Even where adequate protection is required, it may be satisfied by "any reasonable means," *id.* § 129(a), including in certain circumstances "a pledge . . . of future revenues (net of any current expenses, operational expenses or other expenses incurred . . . under this Act)," *id.* § 129(b), and the court may override any requirement of adequate protection in the Act "if and when the police power justifies and authorizes the temporary or permanent use or transfer of property without adequate protection," *id.* § 129(d).

37.     The Act specifies circumstances in which a petitioner may reject a contract, *see* Act § 326, provides that certain *ipso facto* clauses are unenforceable, *see id.* § 325, and provides for the formation of a creditor committee, *id.* § 318.

38.     Regardless of whether PREPA seeks relief under the Act, the passage of the Act has already harmed Plaintiff by unjustifiably diminishing the value of the PREPA bonds.  The Act was introduced on June 25, 2014, and passed on June 28, 2014.  Certain long-dated PREPA bonds lost more than 25% of their market value between June 18 and June 30, and lost more than 30% of their market value by July 2.  Similarly, between June 20 and July 8, certain short-dated PREPA bonds lost almost 30% of their market value.  The Act's passage caused these losses, and the harm continues.

39.    On information and belief, PREPA will further harm Plaintiff by seeking relief under the Act imminently, despite its contractual promises and its enabling statute.  *See* 22 L.P.R.A. § 215.  The Act was designed specifically so that entities such as PREPA could insulate themselves from their contractual obligations.  It notes, for example, that "[p]ublic corporations of the Commonwealth of Puerto Rico that provide essential public services, PREPA being the most dramatic example, today face significant operational, fiscal, and financial challenges."  *See* Act, Statement of Motives.  Moreover, market watchers predict that PREPA is highly likely to seek relief under the Act in the near future.  *See*, *e.g.*, Aaron Kuriloff, *Puerto Rico's Power Authority Taps Reserves To Pay Investors*, Wall St. J. (July 10, 2014), http://online.wsj.com/articles/puerto-ricos-power-authority-taps-reserves-to-pay-investors-1405033187 ("The Puerto Rico Electric Power Authority tapped reserve funds to pay investors last week in the latest sign the cash-strapped utility may soon restructure its debt."); Michael Corkery, *Lenders Agree To Give Puerto Rico Electric Power Authority More Time To Repay Debt*, N.Y. Times DealBook (July 7, 2014), http://dealbook.nytimes.com/2014/07/07/lenders-agree-to-give-puerto-rico-utility-more-time-to-repay-debt/ ("Prepa is seen as a likely test case for how Puerto Rico can solve its debt problems through a recently enacted restructuring law.").

40.    Even if PREPA did not seek relief under the Act, Plaintiff has already suffered injury as a result of the Act.  For example, Section 17 of the Puerto Rico Electric Power Authority Act granted bondholders the right to seek appointment of a receiver if PREPA defaulted.  *See* 22 L.P.R.A. § 207(a).  That right is also protected in Section 804 of the Trust Agreement.  *See* Trust Agreement § 804.  But Section 108 of the Act "supersedes and annuls any insolvency or custodian provision included in the enabling or other act of any public corporation, including Section 17."  Act § 108.  The Act has thus already injured Plaintiff by depriving

bondholders of the right to seek appointment of a receiver.   Moreover, the mere threat that PREPA will file for relief under the Act injures Plaintiff.   Because filing for relief will trigger the suspension and automatic-stay provisions of the Act, the threat that PREPA will imminently file has decreased the value of the PREPA bonds and makes it more difficult to negotiate a favorable settlement with PREPA.   These injuries demonstrate that Plaintiff's challenge is ripe.

## III.   The Act Is Unlawful.

41.   The Act purports to create legal powers that violate the United States Constitution, federal law, and Commonwealth law.

### A.   The Act Is Preempted By The Bankruptcy Clause And Bankruptcy Code.

42.   The Bankruptcy Clause of the United States Constitution provides that "[t]he Congress shall have the Power . . . [t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."   U.S. Const. art. I, § 8, cl. 4.   In accordance with that Clause, the United States Congress has enacted the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

43.   The Act is preempted on numerous independent grounds.

44.   *First*, the Act is preempted because it improperly operates in a field that Congress has comprehensively occupied.   *See Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929) ("States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations."); *see also Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1201, 1203 (9th Cir. 2005); *In re Bank of New England Corp.*, 364 F.3d 355, 364 (1st Cir. 2004) (citing *Pinkus*, 278 U.S. at 265).   Although the Bankruptcy Code "coexists peaceably with" certain state laws, *Sherwood Partners*, 394 F.3d at 1201, federal bankruptcy law "is pervasive" and "involves a federal interest so dominant as to preclude enforcement of state laws

on the same subject," *id.* (internal quotation marks omitted).  Thus, where a law operates "within the heartland of bankruptcy administration," it is preempted.  *Id.*

45.     Despite those settled principles, the Act purports to confer on debtors powers and benefits that are integral to the Bankruptcy Code.  These include:

a.      the ability to modify debt obligations and force creditors to accept partial satisfaction of their claims if threshold levels of creditor support for a restructuring plan can be obtained, *see* Act §§ 202, 312, 315; *cf.* 11 U.S.C. §§ 944, 1126, 1129;

b.      a discharge in the form of a permanent prohibition against enforcing debts (including debts secured by a pledge of present and future revenues of the debtor) that are dealt with by a plan under either Chapter 2 or Chapter 3 of the Act, *see* Act § 115(b)(2), (c)(3); *cf.* 11 U.S.C. § 944(b);

c.      an automatic stay or suspension of proceedings against the debtor, *see* Act §§ 201(d), 205, 304; *cf.* 11 U.S.C. §§ 362, 922;

d.      the capacity to obtain debtor-in-possession financing by granting priority liens on already encumbered property, *see* Act §§ 206, 322(c); *cf.* 11 U.S.C. § 364(d);

e.      the ability to reject contracts, *see* Act § 326; *cf.* 11 U.S.C. § 365; and

f.      protection from the operation of contractual *ipso facto* clauses, *see* Act § 325; *cf.* 11 U.S.C. § 365(e).

46.     The Act further transgresses principles of preemption by providing for the formation of statutory creditor committees, Act § 318; *cf.* 11 U.S.C. § 1102, court oversight of a plan of reorganization, Act §§ 102(18), 109, 110, 114; *cf.* 11 U.S.C. §§ 943, 945, 1128-1129, and

other features commonly associated with the federal bankruptcy regime.  Indeed, the Act explicitly states that "[i]n designing chapter 3, this Legislative Assembly has adopted a model similar to that of chapter 9 of title 11 of the United States Code in order to provide all stakeholders with much needed familiarity" and that the Legislative Assembly "clearly expresses its intent that jurisprudence interpreting the provisions of chapter 9 of title 11 of the United States Code be used, to the extent applicable, for purposes of interpreting the provisions of Chapter 3 of this Act."  Act, Summary of Ch. 3.

47.     *Second*, even if Congress had not entirely displaced state bankruptcy regulation, the Act would still be preempted because its bankruptcy-like provisions would stand as an obstacle to accomplishing and executing Congress's purposes and objectives in enacting a uniform bankruptcy code.  *See, e.g.*, *Sherwood Partners*, 394 F.3d at 1201; *see also Pinkus*, 278 U.S. at 265 ("The power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount.  The purpose to exclude state action for the discharge of insolvent debtors may be manifested without specific declaration to that end; that which is clearly implied is of equal force as that which is expressed." (citation omitted)).  The Act provides differing and competing standards for, among other things, approving a plan and obtaining financing.  The existence of a separate, Puerto Rico-specific system for adjusting the debts of municipalities undermines the uniformity of the federal scheme, particularly given that Congress specifically determined that Puerto Rico municipalities should not be permitted to participate in a bankruptcy scheme.  *See* 11 U.S.C. §§ 101(40), (52); 109(c); *see also infra* ¶ 53.

48.     *Third*, the Act is also preempted because it conflicts with the federal Bankruptcy Code.  *See, e.g.*, *Chi. Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.*, 302 U.S. 120, 126 (1937) ("state laws in conflict with the laws of Congress on the subject of bankruptcies

are suspended . . . to the extent of actual conflict with the system provided by" federal bankruptcy law (citation omitted)); *Pinkus*, 278 U.S. at 263-64 ("A state is without power to make or enforce any law governing bankruptcies that impairs the obligation of contracts or extends to persons or property outside its jurisdiction or conflicts with the national bankruptcy laws."); *Sturges v. Crowninshield*, 17 U.S. 122, 195-97 (1819).  By way of illustration, three examples of conflict are set forth below.

49.     As one example of conflict:  The Bankruptcy Code provides that a "State law" that prescribes a "method of composition of indebtedness" of a municipality "may not bind any creditor that does not consent to such composition," and that "a judgment entered under such a [State] law may not bind a creditor that does not consent to such composition."  11 U.S.C. § 903. (A "composition" is "[a]n agreement between a debtor and two or more creditors for the adjustment or discharge of an obligation for some lesser amount."  Black's Law Dictionary 324-25 (9th ed. 2009).)  This provision was passed in response to the Supreme Court's decision in *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942), which upheld a state statute authorizing state adjustment plans for insolvent municipalities to bind non-consenting creditors.  *Id.* at 516; *see* Frederick Tung, *After Orange County: Reforming California Municipal Bankruptcy Law*, 53 Hastings L.J. 885, 889 & n.16 (2002).  For purposes of determining what constitutes a "State law" under Section 903, the term "State" includes Puerto Rico.  *See* 11 U.S.C. § 101(52).   Section 903 thus confirms that the Bankruptcy Code—and only the Bankruptcy Code—governs the adjustment of debts of a municipality.

50.     Despite Section 903's clear commands, the Act prescribes methods for composition of indebtedness without the consent of creditors, and provides that judgments rendered under the Act will bind creditors who have not consented to such a composition.  For

example, Section 202 of the Act provides that a creditor may be forced to accept a modification of its debt instrument if 50 percent of the creditors in a given "class" vote on such a modification, and 75 percent of those who submit ballots vote in favor of such a modification. Thus, the Act would force Plaintiff's funds to accept partial payment on the secured PREPA bonds if other holders of PREPA bonds vote to accept partial payment. Worse, the Act also provides (under Sections 312 and 315) that, upon acceptance by a single creditor class and court approval, a public entity may enforce a restructuring plan that extinguishes creditors' claims or may only partially satisfy such creditors' claims. Thus, the Act would force Plaintiff's funds to accept partial payment on the PREPA bonds even if every single PREPA bondholder voted against a restructuring plan that a small class of unrelated creditors (such as unsecured trade creditors or employees) voted to accept—thereby creating a square conflict with the Bankruptcy Code.

51.     As another example of conflict:  Section 322(c) of the Act provides that a debtor may obtain credit "secured by a senior or equal lien on the [debtor's] property" even though the same property is already "subject to a [previous] lien"—and that the debtor may do so without any protection for such a previous lien—if, among other things, "the proceeds are needed to perform public functions."  This provision authorizes PREPA to seize the collateral securing the PREPA bonds for the purpose of securing additional lending for itself.

52.     The Bankruptcy Code, however, precludes the grant of a superior lien unless there is "adequate protection" for existing liens.  11 U.S.C. § 364(d)(1).  A grant of a superior lien on property that is already subject to a lien without adequate protection to existing lienholders, as authorized by Section 322(c) of the Act, would violate the Bankruptcy Code.  The Act effectively empowers the Commonwealth to expropriate private property for no compensation

(and no adequate protection) when it asserts the need to do so.  While Section 129 of the Act purports to permit that adequate protection be provided, it expands and renders optional the concept of adequate protection to the point of meaninglessness—in conflict with the Bankruptcy Code.

53.     As a third example of conflict:  In the Bankruptcy Code, Congress provided that only a "municipality" authorized to be a debtor by State law or a State authority may be a "debtor" for purposes of Chapter 9.  11 U.S.C. § 109(c).  "Municipality," in turn, is defined as a "political subdivision . . . or instrumentality of a State."  *Id.* § 101(40).  Although Congress provided that the term "State" includes Puerto Rico in some circumstances, it specifically provided that "State" does *not* include Puerto Rico (or the District of Columbia) "for the purpose of defining who may be a debtor under chapter 9."  *Id.* § 101(52).  In this way, Congress explicitly withheld from Puerto Rico municipalities the ability to be a Chapter 9 debtor.  *See* 2 Collier on Bankruptcy ¶ 101.52 (2014).  Given that municipalities may not be debtors under any other chapter of the Bankruptcy Code, *see* 11 U.S.C. § 109, this definition represents Congress's considered judgment to exclude Puerto Rico municipalities from participating in a bankruptcy regime.

54.     The Act conflicts with—and is therefore preempted by—the Bankruptcy Code because it includes within its reach Puerto Rico municipalities that Congress has expressly excluded from participating in a bankruptcy regime.  *See* Act § 113(b).

**B.     The Act Violates The Contract Clause Of The United States Constitution.**

55.     The Contract Clause of the United States Constitution provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1. Under that Clause, a State may not enact a law that substantially impairs a contractual

relationship unless it is both reasonable and necessary to serve an important government purpose. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25 (1977); *UAW v. Fortuño*, 633 F.3d 37, 41-43 (1st Cir. 2011).

56.    The Act substantially impairs the obligations imposed by the PREPA bonds.  As several examples:

    a.    The Trust Agreement provides that PREPA will promptly pay principal and interest on the bonds in stated amounts, Trust Agreement § 701, that "no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the bondholders might be impaired or diminished," *id.* § 709, and that unanimous consent of bondholders is required to extend the maturity date of the PREPA bonds, reduce principal or interest, or create liens on revenues other than those of the PREPA bonds, *id.* § 1102.  Sections 202, 312, and 315 of the Act substantially impair those touchstone contractual commitments by allowing PREPA to modify its debt obligations without creditors' consent.

    b.    In the Trust Agreement, PREPA pledged that bondholders' rights will not be impaired or diminished.  *See* Trust Agreement § 709.  The Trust Agreement also provides that holders of at least 10 percent of the PREPA bonds are entitled to request that the Trustee bring an action to compel PREPA to set and collect rates sufficient to maintain its promises both to pay current expenses and to maintain at least 120 percent of upcoming principal and interest payments in its general fund.  *Id.* § 502.  The Trust Agreement further entitles bondholders to accelerate payments if PREPA

defaults on the PREPA bonds and to sue in equity or at law to enforce the agreement and seek appointment of a receiver. *See id.* §§ 803, 804. The Act's suspension and stay provisions, *see* Act §§ 205, 304, would substantially impair Plaintiff's funds' right to bring suit to enforce the debt obligations that PREPA owes to them—and would destroy their entitlement to do so on an accelerated basis.

c.  The Trust Agreement prohibits PREPA from selling, leasing, or otherwise disposing of any part of its electrical-power system. Trust Agreement § 712. The Trust Agreement also prohibits PREPA from creating a charge or lien on its revenues ranking equally with or senior to the charge or lien on the revenues of the bonds issued under the Trust Agreement. *Id.* Sections 307 and 322 of the Act substantially impair those obligations by allowing the court to authorize the sale of assets free and clear of liens and by allowing PREPA to encumber collateral with liens senior to bondholders' liens.

d.  The Trust Agreement contains an *ipso facto* clause specifying that an event of default occurs when, among other things, PREPA enters into a proceeding, or an order or decree is entered, for the purpose of effectuating a composition between PREPA and its creditors or for the purpose of adjusting claims that are payable from PREPA revenues. Trust Agreement § 802(f), (g). Section 325 of the Act substantially impairs that obligation by purporting to invalidate such an *ipso facto* clause.

19

e.   The Trust Agreement was negotiated and executed against a legal backdrop in which the Commonwealth itself expressly "pledge[d] to, and agree[d] with, any person, firm or corporation . . . subscribing to or acquiring bonds of [PREPA] . . . that it w[ould] not limit or alter the rights or powers hereby vested in [PREPA] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged." 22 L.P.R.A. § 215.  The Trust Agreement is "assumed to incorporate" this legal norm since it was "in place" at the time of the contract.  *Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184, 188 (1st Cir. 1997).  The Act, however, significantly alters the rights or powers vested in PREPA by allowing it to force its creditors to accept unfavorable modifications to their bonds.  *See, e.g.*, Act §§ 115, 202, 206, 304, 312, 315, 322.  In fact, the Act specifically provides that it "supersedes and annuls any insolvency or custodian provision included in the enabling or other act of any public corporation, including" the receivership provision of the Puerto Rico Electric Power Authority Act, Act § 108(b); *cf.* 22 L.P.R.A. § 207, and also provides that it supersedes the Puerto Rico Electric Power Authority Act to the extent of any contradiction and that the Act should be "interpreted as specifically amending" that statute, Act § 108(c).

57.   The Act's drastic impairment of the PREPA bonds was not necessary in light of the availability of more moderate courses of action and not reasonable in light of the surrounding circumstances.   Several factors confirm that the Act was neither reasonable nor necessary.

58.     The Act was not necessary to accomplish its stated aims because many of the entities that it affects, including PREPA, had and continue to have the ability to provide uninterrupted service and to sustain themselves financially without using the extraordinary measures provided by the Act.  PREPA in particular could use various measures to "improve[e]" its "fiscal condition" "without affecting [its] essential functions."  Act § 101(e).

59.     *First*, PREPA could modestly increase its rates to provide the revenues that it needs to satisfy its obligations under the PREPA bonds.  The ability of PREPA to cover much of its operating, capital, and financial obligations, including the PREPA bonds, rests on its basic rate charges.  Yet PREPA has not increased those basic charges since 1989.  A modest increase of those charges would alone enable PREPA to sustain itself financially without the measures provided by the Act.

60.     *Second*, PREPA could collect what the Commonwealth and other municipal entities owe to it.  Under Puerto Rico law, PREPA is exempt from tax, 22 L.P.R.A. § 212(a), but is required to set aside 11 percent of its gross income and pay a portion of it to "the municipalities" as a "contribution in lieu of taxes."  *Id.* § 212(b)(2).  Puerto Rico law requires that the PREPA bonds take priority over the contributions, *see id.* § 212(b)(3), and provides that the obligation to provide such contributions is subordinate to PREPA's pledge of net revenues. In practice, however, PREPA has treated the contributions as senior to the PREPA bonds by simply giving the municipalities credits on their electric bills rather than collecting the full amount of the bill.  By collecting what it is owed—in accordance with Puerto Rico law—PREPA could sustain itself financially without the measures provided by the Act.

61.     *Third*, PREPA can improve its standing in the global capital markets and take other measures to improve relationships with creditors.  PREPA has not been reported to have

21

hired a capital markets investment banker since its 2013A bonds were issued, it has not presented publicly to investors since May 2013, and it has not publicly disclosed any intention to apply for a federal guarantee under the $8 billion "Advanced Fossil Energy Projects" solicitation issued by the Department of Energy in December 2013.  PREPA has not responded, moreover, to requests to provide financing on terms that may be mutually beneficial.  A coherent strategy for accessing the capital markets would help enable PREPA to normalize its relationships with creditors and to sustain itself financially without the measures provided by the Act.

62.     *Fourth*, PREPA could cut many needless costs.   PREPA's cost structure is reported to be laden with "operational inefficiencies" and a "bloated, benefits-laden bureaucracy."  John Marino, *Let's Think Big*, Caribbean Business (Dec. 5, 2013).  PREPA management itself recently reported that PREPA could substantially cut costs.  Cutting its costs would materially allow PREPA to sustain itself financially without the measures provided by the Act.

63.     *Fifth*, PREPA could negotiate with creditors.  Yet the Act was passed before PREPA and similarly situated debtors made any meaningful good-faith effort to restructure their debt on a voluntary basis.  Voluntary debt restructuring is regularly used by other entities that are not eligible for bankruptcy proceedings—including sovereign nations—to manage debts that they cannot repay.  It is an effective method of meeting the debtor's financial needs while protecting creditors' interests.  No meaningful effort was made at voluntary debt restructuring before the Act was passed.  The Act was unnecessary because voluntary restructuring could have adequately addressed the problems at which the Act purportedly aims.

64.     Given the availability of these solutions and others, impairing contracts to ensure the financial self-sufficiency of public entities was entirely unnecessary.  Indeed, Puerto Rico's

Resident Commissioner, Pedro Pierluisi, described the "process by which the Governor of Puerto Rico and the territory's Legislative Assembly . . . approved" the Act as "characterized by haste, a lack of transparency, *and no public debate about the suitability of alternative ways to address the problem*."  Pierluisi Statement on Puerto Rico and Chapter 9 of the U.S. Bankruptcy Code (July 10, 2014) (emphasis added), *available at* http://pierluisi.house.gov/media-center/press-releases/pierluisi-statement-on-puerto-rico-and-chapter-9-of-the-us-bankruptcy.

65.   The Act was also unreasonable because it was passed to protect particular individuals and groups rather than to protect a basic societal interest.  The Act protects special interests and groups rather than the public by targeting only financial debt for restructuring.

66.   *First*, the Act advances the interests of particular creditors and stakeholders at the expense of Plaintiff and other creditors.  Whereas the Act allows the PREPA bonds to be severely compromised without creditor consent, Section 327 of the Act requires PREPA to "pa[y] to the maximum extent practicable"—and thus prefers—certain debts.  These debts generally include "claims for the provision of goods or services" that fall below a debtor-specified threshold of at least $1 million and do not arise under a rejected contract, Act § 102(52); claims owed to other public corporations for providing goods or services; claims owed to the United States; certain claims for money owed to a Commonwealth Entity, defined to include the Commonwealth itself, *see id.* § 102(13); and certain debts owed to vendors for providing goods or services that the public entity designates as critical to its ability to perform public functions, *see id.* § 102(23).  These exceptions and preferences underscore that the Act is unreasonable.

67.   *Second*, the Act advances the interests of Puerto Rico municipalities at the expense of PREPA's creditors by failing to address PREPA's treatment of certain required

23

contributions to municipalities. As described above, PREPA's collection practices ultimately reduce the amount of revenue available to pay the PREPA bonds. By remaining silent on this longstanding problem, the Act implicitly ratifies it—undermining any argument that the Act was reasonable to address any emergency.

68.     *Third*, the Act advances the interests of the Commonwealth by saddling creditors with the consequences of the Commonwealth's longstanding financial improvidence. The Commonwealth has long required PREPA—which historically has obtained much of its funding through private financing—to subsidize government entities through contributions in lieu of taxes and other subsidies. Thus, by declaring in the Act that the Development Bank and Treasury would "no longer provide financing to cover operating deficits of the public corporations," the Commonwealth is effectively forcing creditors to pay for its own financial mismanagement. Act, Statement of Motives.

69.     *Fourth*, the Act is particularly unreasonable in light of the acutely strong reliance interests at issue. The Commonwealth "pledge[d] to" PREPA bond investors "that it w[ould] not limit or alter the rights or powers hereby vested in [PREPA] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged." 22 L.P.R.A. § 215. The Commonwealth also expressly guaranteed a receivership remedy upon an event of default, as well as comprehensive other remedies. *See id.* §§ 207-208. Plaintiff's funds relied on these representations when they agreed to buy the PREPA bonds, and the Act eviscerates each of those promises.

70.     The Act is not an emergency measure—both for reasons discussed above and because it is apparently permanent.

71.    *First*, as described above, there is no bona fide emergency that requires the Act. When the Act was passed (as now), PREPA had available to it many options for achieving financial self-sufficiency—by raising rates, collecting what it is owed, engaging the capital markets, cutting costs, and negotiating with creditors.   The fact that the Act prefers some creditors over others further undermines any claim that any emergency necessitated the Act.

72.    *Second,* the Act is not limited to the purported emergency to which it is responding.   Whereas bona fide emergency measures are generally temporary, the Act is apparently permanent.  It thus would allow a public entity to participate in the bankruptcy regime it establishes irrespective of whether an "emergency" actually exists.

73.    In sum, because the Act substantially, unreasonably, and unnecessarily impairs the obligation of contracts, it violates the Contract Clause of the United States Constitution.

**C.    The Act Violates The Contract Clause Of The Puerto Rico Constitution.**

74.    For the reasons set forth above, the Act also violates the Contract Clause of the Puerto Rico Constitution.  That Clause provides:  "No laws impairing the obligation of contracts shall be enacted."  P.R. Const. art. II, § 7.  That provision is analogous to the Contract Clause of the United States Constitution and provides at least the same level of protections against impairments of the obligation of contracts.  *See*, *e.g.*, *Bayrón Toro v. Serra*, 19 P.R. Offic. Trans. 646, 661-62 (P.R. 1987); *Warner Lambert Co. v. Superior Court of Puerto Rico*, 1 P.R. Offic. Trans. 527, 550-53 (P.R. 1973).

75.    This court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over this claim arising under the Puerto Rico Constitution because it is so closely related to Plaintiff's other claims that it "form[s] part of the same case or controversy under Article III of the United

25

States Constitution." *See also*, *e.g.*, *Ortiz-Bonilla v. Federación de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 35 (1st Cir. 2013).

  **D.**  **The Act Denies Litigants Access To The Courts And Exceeds The Commonwealth's Authority.**

  76.  Sections 205 and 304 of the Act provide that a public entity may obtain a suspension or automatic stay of all proceedings against the entity and any related proceedings against the Commonwealth and any elected official or employee of the entity.

  77.  State courts may not, however, enjoin proceedings in federal court. *See*, *e.g.*, *Donovan v. City of Dallas*, 377 U.S. 408, 411-13 (1964). To the extent any provision of the Act enjoins, stays, suspends, or precludes Plaintiff's funds from exercising their rights in federal court, including the right to challenge the constitutionality of the Act itself in federal court, those provisions also violate the Constitution.

**CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF**

  78.  Plaintiff re-alleges the allegations contained in paragraphs 1 through 77.

  79.  The Act threatens to improperly impair Plaintiff's funds' rights under the PREPA bonds in conflict with the Bankruptcy Clause of the United States Constitution, the Contract Clause of the United States Constitution, and the Contract Clause of the Puerto Rico Constitution.

  80.  By authorizing PREPA to seek relief under the Act on the PREPA bonds, the defendants would be furthering these violations of the Bankruptcy Clause of the United States Constitution, the Contract Clause of the United States Constitution, and the Contract Clause of the Puerto Rico Constitution.

81.     To the extent any provision of the Act enjoins, stays, suspends, or precludes bondholders from exercising their rights in federal court, the Act would also violate the constitutional right of access to federal court.

82.     Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 that the Act is unconstitutional and an injunction prohibiting the Act from being enforced.

83.     Plaintiff therefore respectfully prays for a judgment:

a.      declaring that the Act in its entirety, and any prospective enforcement of the Act or authorization under it, violates Article I, Section 8 of the United States Constitution as an improper exercise of bankruptcy legislation by a body other than the Congress of the United States and otherwise is preempted by the federal Bankruptcy Code;

b.      declaring that the Act, and any prospective enforcement of it or authorization under it, violates Article I, Section 10, Clause 1 of the United States Constitution insofar as it permits the retroactive impairment of rights under the contracts governing the PREPA bonds;

c.      declaring that the Act, and any prospective enforcement of it or authorization under it, violates Article II, Section 7 of the Puerto Rico Constitution insofar as it permits the retroactive impairment of rights under the contracts governing the PREPA bonds;

d.      declaring that the Act, and any prospective enforcement of it or authorization under it, violates the United States Constitution insofar as it authorizes any suspension or stay of federal court proceedings;

e.      enjoining the enforcement or implementation of the Act;

f.      awarding costs, including attorneys' fees; and

g.      granting such other and further relief as the Court deems just and proper.


Dated:   San Juan, Puerto Rico

July 22, 2014                                        INDIANO & WILLIAMS, PSC


By:  /s/ David C. Indiano
     DAVID C. INDIANO
     JEFFREY M. WILLIAMS
     LETICIA CASALDUC-RABELL
     USDC-PR Nos. 200601, 202414, 123513
     207 Del Parque St., 3d Floor
     San Juan, P.R.  00912
     Telephone:   787.641.4545
     Facsimile:    787.641.4544
     E-mail:  david.indiano@indianowilliams.com
              jeffrey.williams@indianowilliams.com
              leticia.casalduc@indianowilliams.com


     – and –

     GIBSON, DUNN & CRUTCHER LLP


By:  /s/ Theodore B. Olson
     THEODORE B. OLSON
     MATTHEW D. MCGILL
     MATTHEW J. WILLIAMS
     SCOTT G. STEWART
     1050 Connecticut Avenue, N.W.
     Washington, D.C.  20036
     Telephone:   202.955.8500
     Facsimile:    202.467.0539
     E-mail: tolson@gibsondunn.com

     Attorneys for Plaintiff

28