UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

----------------------------------------------------------x
:
Franklin California Tax-Free Trust, et al.,     :
:
          Plaintiffs,    :
:
    -against-    :   Civil No. 14-1518 (FAB)
:
Commonwealth of Puerto Rico, et al.,   :
:
         Defendants.    :
----------------------------------------------------------x
:
BlueMountain Capital Management, LLC, for  :
itself and for and on behalf of investment funds :
for which it acts as investment manager,  :
:
         Plaintiff,    :   Civil No. 14-1569 (FAB)
:
    -against-    :
:
Alejandro J. García Padilla, et al.,   :
:
         Defendants.    :
----------------------------------------------------------x

# MEMORANDUM OF LAW OF BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

INDIANO & WILLIAMS, PSC
DAVID C. INDIANO
JEFFREY M. WILLIAMS
LETICIA CASALDUC-RABELL
USDC-PR Nos. 200601, 202414, 123513
207 Del Parque St., 3d Floor
San Juan, P.R.  00912
Telephone:  787.641.4545
Facsimile:  787.641.4544

– and –

GIBSON, DUNN & CRUTCHER LLP
THEODORE B. OLSON
MATTHEW D. MCGILL
MATTHEW J. WILLIAMS
SCOTT G. STEWART
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................ii

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

      A.    The PREPA Bonds And The Commonwealth's Contractual
           Promises.................................................................................................2

      B.    The Bankruptcy Code, The Act, And PREPA's Impending Default..........3

           1.    The Federal Bankruptcy Regime .......................................................4

           2.    The Regime Established By The Act............................................5

           3.    PREPA's Impending Default...................................................6

ARGUMENT ........................................................................................................7

    I.    BlueMountain's Claims Are Ripe..........................................................7

      A.    BlueMountain's Claims Are Fit For Judicial Decision..............................7

      B.    Withholding Judicial Review Would Cause Additional Hardship. ..........11

    II.    BlueMountain Adequately Pleaded That The Bankruptcy Code Preempts
        The Act..................................................................................................12

      A.    The Act Is Preempted Because It Operates In A Field That
           Congress Has Comprehensively Occupied.............................................12

      B.    The Act Is Preempted Because It Is An Obstacle To The
           Accomplishment And Execution Of Congress's Full Purposes And
           Objectives. ...........................................................................................19

      C.    The Act Is Preempted Because It Conflicts With The Bankruptcy
           Code. ...................................................................................................20

    III.    BlueMountain Adequately Pleaded That The Act Violates The Contract
        Clauses. .................................................................................................23

      A.    The Act Substantially Impairs Contractual Rights. .................................23

      B.    The Act Is Not Reasonable Or Necessary..................................................26

    IV.    BlueMountain Adequately Pleaded That The Act Impermissibly Denies
        Access To Federal Courts. .....................................................................29

CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Antilles Cement Corp. v. Fortuño,*
   670 F.3d 310 (1st Cir. 2012)..................................................................................18, 19

*Armstrong World Indus., Inc. v. Adams,*
   961 F.2d 405 (3d Cir. 1992) ...............................................................................................9

*Ashton v. Cameron Cnty. Water Improvement Dist.,*
   298 U.S. 513 (1936) ........................................................................................................14

*Asociacion de Suscripcion Conjunta del Suguro de Responsabilidad Obligatorio v.*
   *Juarbe-Jimenez,*
   642 F. Supp. 2d 73 (D.P.R. 2009) ...................................................................................10

*Bayrón Toro v. Serra,*
   19 P.R. Offic. Trans. 646 (P.R. 1987) .............................................................................23

*Bluetarp Fin., Inc. v. Matrix Constr. Co.,*
   709 F.3d 72 (1st Cir. 2013)..............................................................................................30

*Chamber of Commerce v. Reich,*
   57 F.3d 1099 (D.C. Cir. 1995).............................................................................................9

*Chi. Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.,*
   302 U.S. 120 (1937) ........................................................................................................20

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
   751 F.3d 427 (6th Cir. 2014)...........................................................................................21

*Cook v. Gates,*
   528 F.3d 42 (1st Cir. 2008)..............................................................................................27

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ........................................................................................................13

*Donovan v. City of Dallas,*
   377 U.S. 408 (1964) ........................................................................................................29

*Emp'rs Ass'n, Inc. v. United Steelworkers of Am.,*
   32 F.3d 1297 (8th Cir. 1994) .............................................................................................9

*Ernst & Young v. Depositors Econ. Prot. Corp.,*
   45 F.3d 530 (1st Cir. 1995)...................................................................................7, 8, 9, 11

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
   316 U.S. 502 (1942) ...............................................................................................14, 15, 26

*Hanover Nat'l Bank v. Moyses,*
   186 U.S. 181 (1902) ........................................................................................................13

*Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*,
   756 F.3d 1032 (7th Cir. 2014) ................................................................17

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984) ..............................................................................30

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
   471 U.S. 707 (1985) ..............................................................................13

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934) ..............................................................................28

*Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*,
   984 F.2d 1507 (9th Cir. 1993) ................................................................10

*In re Bank of New England Corp.*,
   364 F.3d 355 (1st Cir. 2004)..........................................................13, 14

*In re Boston Reg'l Med. Ctr., Inc.*,
   291 F.3d 111 (1st Cir. 2002)..................................................................13

*In re Israel-British Bank (London) Ltd.*,
   536 F.2d 509 (2d Cir. 1976) ..................................................................18

*Int'l Shoe Co. v. Pinkus*,
   278 U.S. 261 (1929) ........................................................................13, 20

*McCullen v. Coakley*,
   571 F.3d 167 (1st Cir. 2009)..................................................................24

*McInnis-Misenor v. Me. Med. Ctr.*,
   319 F.3d 63 (1st Cir. 2003)..........................................................9, 11, 12

*Mercado-Boneta v. Administración del Fondo de Compensación al Paciente*,
   125 F.3d 9 (1st Cir. 1997)...............................................................25, 28

*Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*,
   325 F.3d 879 (7th Cir. 2003) ...................................................................9

*Munich Am. Reinsurance Co. v. Crawford*,
   141 F.3d 585 (5th Cir. 1998) ..................................................................17

*Ocasio-Hernandez v. Fortuno-Burset*,
   640 F.3d 1 (1st Cir. 2011).........................................................................7

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) .....................................................................7, 9, 11

*Patterson v. Carey*,
   52 A.D.2d 171 (N.Y. App. Div. 1976) ....................................................24

*PPL EnergyPlus, LLC v. Nazarian*,
   753 F.3d 467 (4th Cir. 2014) ..................................................................19

*Princess Lida of Thurn & Taxis v. Thompson*,
   305 U.S. 456 (1939) ..............................................................................29

*Roman Catholic Bishop of Springfield v. City of Springfield,*
   724 F.3d 78 (1st Cir. 2013)........................................................................................9

*Ry. Labor Executives' Ass'n v. Gibbons,*
   455 U.S. 457 (1982)..............................................................................................18

*Segal v. Rochelle,*
   382 U.S. 375 (1966)..............................................................................................25

*Sherwood Partners, Inc. v. Lycos, Inc.,*
   394 F.3d 1198 (9th Cir. 2005)..............................................................................13

*Stern v. U.S. Dist. Court,*
   214 F.3d 4 (1st Cir. 2000).....................................................................................12

*St. Paul Fire & Marine Ins. Co. v. Barry,*
   438 U.S. 531 (1978)..............................................................................................17

*State of R.I. v. Narragansett Indian Tribe,*
   19 F.3d 685 (1st Cir. 1994)...................................................................................10

*Sturges v. Crowninshield,*
   17 U.S. (4 Wheat.) 122 (1819)..............................................................................14

*Telecomms. Regulatory Bd. v. CTIA-The Wireless Ass'n,*
   752 F.3d 60 (1st Cir. 2014)...................................................................................12

*Texas v. United States,*
   523 U.S. 296 (1998)..............................................................................................10

*U.S. Trust Co. of N.Y. v. New Jersey,*
   431 U.S. 1 (1977)...................................................................................8, 23, 25, 28

*UAW v. Fortuño,*
   633 F.3d 37 (1st Cir. 2011)............................................................................23, 28

*United States v. Bekins,*
   304 U.S. 27 (1938).........................................................................................15, 19

*United States v. Locke,*
   529 U.S. 89 (2000)................................................................................................19

*Valentin v. Hosp. Bella Vista,*
   254 F.3d 358 (1st Cir. 2001)...................................................................................7

*Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark,*
   310 U.S. 32 (1940)................................................................................................28

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008)..............................................................................................24

*Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n,*
   443 U.S. 658 (1979)..............................................................................................29

*Yee v. City of Escondido,*
   503 U.S. 519 (1992)..............................................................................................11

**Constitutional Provisions**

U.S. Const. art. I, § 8.................................................................................13, 14

U.S. Const. art. I, § 10.......................................................................1, 23, 24, 25

U.S. Const. art. VI...........................................................................................29

P.R. Const. art. II, § 7..................................................................................23, 25

**Statutory Provisions**

11 U.S.C. § 101........................................................................4, 16, 18, 20, 22

11 U.S.C. § 103.............................................................................................21

11 U.S.C. § 109.........................................................................................4, 16

11 U.S.C. § 312..............................................................................................6

11 U.S.C. § 362..............................................................................................4

11 U.S.C. § 364.........................................................................................4, 22

11 U.S.C. § 901..............................................................................................4

11 U.S.C. § 903...........................................................................4, 14, 20, 21, 22

11 U.S.C. § 922..............................................................................................4

11 U.S.C. § 941..............................................................................................4

11 U.S.C. § 944..........................................................................................4, 5

11 U.S.C. § 1129........................................................................................4, 5

12 U.S.C. § 1465...........................................................................................17

12 U.S.C. § 25b.............................................................................................17

15 U.S.C. § 1012...........................................................................................17

22 L.P.R.A. § 207......................................................................................2, 26

22 L.P.R.A. § 208......................................................................................2, 26

22 L.P.R.A. § 215..............................................................................2, 8, 24, 26

P.R. Law No. 71-2014 § 102.....................................................................5, 6, 30

P.R. Law No. 71-2014 § 108.............................................................................8

P.R. Law No. 71-2014 § 109.............................................................................5

P.R. Law No. 71-2014 § 110.............................................................................5

P.R. Law No. 71-2014 § 112.............................................................................5

P.R. Law No. 71-2014 § 113.............................................................................5

P.R. Law No. 71-2014 § 114.............................................................................5

P.R. Law No. 71-2014 § 115 ....................................................................5, 16, 19

P.R. Law No. 71-2014 § 129 ...............................................................................6

P.R. Law No. 71-2014 § 201 ............................................................................5, 6

P.R. Law No. 71-2014 § 202 ...............................................................................5

P.R. Law No. 71-2014 § 204 ...............................................................................5

P.R. Law No. 71-2014 § 205 ..........................................................................6, 29

P.R. Law No. 71-2014 § 206 ...............................................................................6

P.R. Law No. 71-2014 § 301 ...............................................................................5

P.R. Law No. 71-2014 § 304 ....................................................................6, 12, 30

P.R. Law No. 71-2014 § 305 ....................................................................6, 12, 30

P.R. Law No. 71-2014 § 310 ...............................................................................5

P.R. Law No. 71-2014 § 312 ...............................................................................6

P.R. Law No. 71-2014 § 315 ...............................................................................6

P.R. Law No. 71-2014 § 322 ..........................................................................6, 22

P.R. Law No. 71-2014 § 325 ...............................................................................6

P.R. Law No. 71-2014 § 327 .............................................................................26

Pub. L. No. 481, § 83, 60 Stat. 409 (1946) ...................................................15, 22

## Legislative Materials

H.R. Rep. No. 79-2246 (1946).........................................................................15, 20

H.R. Rep. No. 94-686 (1975).............................................................................15

S. Rep. No. 95-989 (1978)................................................................................22

## Rules

Fed. R. Civ. P. 8 ................................................................................................7

Fed. R. Civ. P. 12 ..............................................................................................7

## Other Authorities

*Black's Law Dictionary* (9th ed. 2009).................................................................4

Restatement (Second) of Contracts § 344............................................................25

William Selway & Derek Wallbank, *Puerto Rico Municipal Bankruptcy Proposed in U.S. House Bill*, Bloomberg (July 31, 2014).............................................................16, 17

**INTRODUCTION**

Plaintiff BlueMountain Capital Management, LLC respectfully opposes Defendants' motion to dismiss (Dkt. 29).  Contrary to Defendants' contentions, BlueMountain's claims challenging the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, Law No. 71-2014 (the "Act"), are ripe and BlueMountain has adequately pleaded its claims.

*First*, BlueMountain's claims are ripe because they rest on harms that BlueMountain has already suffered.  The Act broke the Commonwealth's contactual promise not to "alter" the Puerto Rico Electric Power Authority's ("PREPA") rights or powers and immediately eliminated bondholders' right to seek appointment of a receiver to enforce their rights.  BlueMountain seeks relief to halt those injuries and to prevent further harm once the Act is invoked.  Once the Act is invoked, it would purport to bar BlueMountain's suit on threat of punitive damages.  Relief is needed now.

*Second*, BlueMountain has adequately alleged that the Act establishes an unlawful bankruptcy system.  Indeed, Defendants *admit* that the Act "creates a mechanism for Puerto Rico's public corporations to restructure their debts" and is "patterned after the federal Bankruptcy Code."  Dkt. 29-1 ("Mem."), at 1, 4.  As BlueMountain pleaded, Congress has occupied the field of municipal bankruptcies through the federal Bankruptcy Code and thus has preempted regimes like the one erected by the Act; the Act is an obstacle to effecuating Congress's determination that municipal bankruptcy law should be uniform throughout the United States and that Puerto Rico public corporations should not participate in bankruptcy proceedings; and the Act's provisions conflict with multiple Bankruptcy Code provisions.

*Third*, BlueMountain adequately pleaded that the Act unlawfully impairs the obligation of contracts, and accordingly is invalid under the Contract Clauses of the United States and Puerto Rico Constitutions.  BlueMountain alleged that the Act substantially harms its contractual

1

rights, and that this injury is unreasonable and unnecessary given the welter of alternatives at the Commonwealth's disposal.  Defendants downplay these harms, but they cannot paper over the fact that BlueMountain has alleged everything needed to state a Contract Clause claim.

*Fourth*, BlueMountain has properly pleaded that the Act tramples on the right of access to federal court through its sweeping automatic-stay provision.  Defendants' contrary argument—that the Act falls within a narrow exception to that right of access—is unavailing.

The motion to dismiss should be denied.

## BACKGROUND

### A.     The PREPA Bonds And The Commonwealth's Contractual Promises

In 1941, the Commonwealth created PREPA and authorized it to issue bonds (the "PREPA bonds") under the Puerto Rico Electric Power Authority Act, Act No. 83 (1941) ("Authority Act").  By the Authority Act, the Commonwealth "pledge[d] to, and agree[d] with, any person, firm or corporation . . . subscribing to or acquiring bonds of [PREPA] . . . that it w[ould] not limit or alter the rights or powers hereby vested in [PREPA] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  22 L.P.R.A. § 215.  The statute promises PREPA bondholders the right to the appointment of a receiver if a default occurs, *see id.* § 207, and to other remedies, *see id.* § 208.

PREPA issued the PREPA bonds under a trust agreement with U.S. Bank National Association as Successor Trustee (the "Trustee"), dated January 1, 1974, as amended and supplemented through August 1, 2011 ("Trust Agreement") (Am. Compl. (Dkt. 20), Ex. A).  PREPA promised to manage and collect rates to meet its bond obligations, Trust Agreement § 502, which are secured by a pledge of PREPA's net revenues from its electric generation and distribution system, *see id.* §§ 701, 705.  The Trust Agreement provides that as long as the PREPA bonds are

outstanding, "no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the bondholders might be impaired or diminished." *Id.* § 709.

PREPA agreed that bondholders could sue to enforce the Trust Agreement or seek appointment of a receiver. *See* Trust Agreement §§ 803, 804. The Trust Agreement contains an *ipso facto* clause specifying that default occurs when, among other things, PREPA is "rendered incapable of fulfilling its obligations" under the Trust Agreement, an order or decree is entered for the purpose of restructuring PREPA's debts, or a proceeding is instituted for that purpose. *Id.* § 802(c), (f), (g). PREPA also pledged that if it failed to manage its rates so that it could pay current expenses and maintain 120 percent of upcoming principal and interest payments, the holders of at least 10 percent of the amount of the PREPA bonds could request that the Trustee bring suit to compel PREPA to do so, regardless of whether a default occurred. *Id.* § 502.

Recently, BlueMountain and some other PREPA bondholders agreed to a limited forbearance period—expiring no later than March 31, 2015—during which they agreed not to exercise certain of their rights under the Trust Agreement upon default. *See* Mem. 9.

In acquiring the PREPA bonds, bondholders relied on the Commonwealth's promises in the Authority Act and PREPA's promises in the Trust Agreement. Am. Compl. ¶¶ 17, 69.

### B.     The Bankruptcy Code, The Act, And PREPA's Impending Default

The Act was introduced on June 25, 2014, and signed into law on June 28. Am. Compl. ¶ 20. The Act purports to enable certain public entities of the Commonwealth to insulate themselves from obligations to their creditors and to modify those debts without the consent of all creditors. The Act purports to be modeled on the federal Bankruptcy Code, but diverges from the Bankruptcy Code in ways that harm creditors of the Commonwealth's public entities and defeat the federal bankruptcy scheme. *Id.* ¶¶ 21-29, 31-37.

### 1.      The Federal Bankruptcy Regime

Chapter 9 of the Bankruptcy Code, 11 U.S.C. §§ 901 *et seq.*, governs the adjustment of debts of municipalities, including public entities, *id.* § 101(40).  A municipality seeking to adjust its debts under Chapter 9 must file a plan with a bankruptcy court.  *See id.* § 941.  The court may confirm the plan—and thereby bind non-consenting creditors—if, among other requirements, each impaired class of claims accepts the plan.  *See id.* §§ 944(a), 1129(a)(8).  The bankruptcy court also may compel non-consenting creditors to be bound by a plan if it meets certain standards of fairness.  *See id.* §§ 944(a), 1129(b)(1), 1129(b)(2)(A)-(B).

Chapter 9 incorporates Bankruptcy Code provisions that automatically stay creditors' enforcement efforts against the debtor while bankruptcy proceedings are pending.  *See* 11 U.S.C. §§ 362, 901, 922.  Chapter 9 also allows municipalities to obtain credit during an automatic stay, so long as they provide "adequate protection" for preexisting interests.  *See id.* §§ 364, 901.

Only a "municipality" may be a debtor under Chapter 9.  11 U.S.C. § 109(c)(1).  The term "municipality" includes a public corporation or instrumentality of a "State," *id.* § 101(40), but the term "State" does not include the District of Columbia or Puerto Rico "for the purpose of defining who may be a debtor under chapter 9," *id.* § 101(52).  In this way, Congress prohibited municipalities of Puerto Rico, such as PREPA, from filing for bankruptcy under Chapter 9.

Section 903 of the Bankruptcy Code bars "State[s]" from "prescribing a method of composition of indebtedness of [their] municipalit[ies]" that can "bind any creditor that does not consent to such composition."  11 U.S.C. § 903(1).  A "composition" is a debt restructuring or discharge.  *Black's Law Dictionary* 324-25 (9th ed. 2009).  Puerto Rico is a "State" for purposes of Section 903, *see* 11 U.S.C. § 101(52), and thus may not bind non-consenting municipal creditors.

2.        **The Regime Established By The Act**

Although Congress excluded Puerto Rico public entities from being debtors under Chapter 9, and although federal law preempts state bankruptcy schemes for municipalities, the Act purports to create such a scheme for the Commonwealth's public entities.  Am. Compl. ¶¶ 30-37.

The Act creates a Commonwealth bankruptcy court to resolve cases under the Act.  *See* Act §§ 102(18), 109-110, 114.  Chapters 2 and 3 of the Act each provide a method for restructuring debt.  Eligible public entities may seek relief under either or both provisions.  *Id.* § 112.

Chapter 2 provides for a partially consensual restructuring procedure similar to the Bankruptcy Code's procedure for confirming a pre-negotiated plan with a threshold level of creditor consent.  *See* 11 U.S.C. §§ 944(a), 1129(a)(8).  Under the Act, a public entity authorized by the Government Development Bank for Puerto Rico ("GDB") or the Governor may submit to the court a plan, or "recovery program," containing proposed modifications, waivers, or exchanges to or of specified debt instruments.  Act §§ 113(a), 201(b), 202(a)-(b).  If creditors of at least 50 percent of the amount of debt of a class participate in a vote, and creditors of at least 75 percent of the amount of debt that participates approve it, then, subject to certain conditions, the court may approve the plan.  *See id.* §§ 202(d), 204.  At that point, "creditors may not bring a separate action to enforce their original claims."  Mem. 5 (citing Act § 115(b)).

Chapter 3 of the Act provides for a restructuring process to bind entire classes of non-consenting creditors.  The process begins when the public entity files with the court a petition setting forth the amount and types of claims to be affected by a restructuring plan.  *See* Act § 301(d); *see also id.* § 113(b), 301(a).  If the court concludes that the petitioner is eligible, the petitioner or the GDB may propose a plan to the court.  *Id.* § 310.  The court may confirm the plan if, among other things, "at least one class of affected debt has voted to accept the plan by a majority of all votes cast in such class and two-thirds of the aggregate amount of affected debt in

5

such class that is voted." *Id.* § 315(e); *see id.* §§ 312, 315.  At that point, "all creditors are bound by the plan" and may not enforce the original debt instrument.  Mem. 6 (citing Act § 115(b)-(c)).

Chapters 2 and 3 provide for a suspension period and automatic stay, respectively, which bar creditors from exercising contractual remedies against debtors invoking the Act and stay actions against the Commonwealth and the GDB.  *See* Act §§ 102(32), 201(d), 205, 304.  A violation of the automatic stay is punishable by punitive damages.  *Id.* § 305.  The Act allows public entities to obtain credit during the Chapter 2 suspension period or the Chapter 3 automatic-stay period.  *See id.* §§ 206, 322.  Yet unlike under the Bankruptcy Code, a public entity that is unable to obtain unsecured credit may in some circumstances grant a lien of equal or greater seniority to preexisting liens on the same property *without* providing adequate protection to the preexisting lienholder.  *Id.* § 322(c)(2)(A).  Alternatively, such protection may be provided by "any reasonable means," *id.* § 129(a), including, in some cases, a "pledge" of future net revenues, *id.* § 129(b).  Or the court may dismiss the requirement when it finds that "the police power justifies" doing so.  *Id.* § 129(d).

The Act also provides that certain *ipso facto* clauses are unenforceable.  *See* Act § 325.  And it describes itself as "designed in many respects to mirror certain key provisions of [the Bankruptcy Code]," with Chapter 3 "model[ed]" on Chapter 9.  Act, Statement of Motives § E.

### 3.    PREPA's Impending Default

BlueMountain and funds that it manages hold more than $400 million of the PREPA bonds.  Am. Compl. ¶ 6.  The Act has diminished the value of these bonds.  As noted, the Act was introduced on June 25 and passed on June 28.  Certain long-dated PREPA bonds lost more than 25 percent of their market value between June 18 and 30, and more than 30 percent by July 2.  *Id.* ¶ 39.  Certain short-dated PREPA bonds lost almost 30 percent of their market value between June 20 and July 8.  *See id.*  The threat that PREPA will file for relief under the Act, trig-

6

gering the Act's suspension or automatic stay provisions, exacerbates these harms and makes it difficult for BlueMountain to negotiate a fair settlement with PREPA.  *See id.* ¶ 38.  If PREPA seeks relief under the Act, it will further harm BlueMountain.  *See id.* ¶ 40.

## ARGUMENT

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To withstand a motion to dismiss, a complaint need only provide "fair notice to the defendants and state a facially plausible claim." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11-12 (1st Cir. 2011).  When evaluating a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), courts "credit the plaintiff's well-pleaded factual allegations . . . [and] draw all reasonable inferences from them in [the plaintiff's] favor." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

## I.   BlueMountain's Claims Are Ripe.

BlueMountain's claims are ripe because they stem from concrete injuries and present predominantly legal questions that would not benefit from further development.  Defendants' arguments to the contrary, *see* Mem. 8-13, lack merit.

Ripeness "turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (citation and internal quotation marks omitted).  Both factors demonstrate that each of BlueMountain's claims is ripe.

### A.   BlueMountain's Claims Are Fit For Judicial Decision.

The fitness factor accounts for the "pragmatic" concern that it is "at best difficult and often impossible" for courts to issue opinions "based on speculative facts or a hypothetical record." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995).  Defendants argue that BlueMountain's claims are not fit for judicial consideration because PREPA has not

filed for relief under the Act.  Mem. 9.  But such a filing is unnecessary:  Each of Blue-Mountain's claims has the "finality" and "definiteness" needed to make it fit for judicial review. *Ernst & Young*, 45 F.3d at 535.

   **1.**  BlueMountain's preemption claims are fit for review.  Defendants claim that the Act has not "caused [BlueMountain] any legally cognizable injury" because it has not been "invoked," Mem. 8; they assert that the "federal courts should not decide challenges to statutory provisions that have not been, and may never be, invoked," Mem. 9.  But the amended complaint specifically alleges that, even before being invoked by PREPA, the Act's enactment *itself* harmed BlueMountain.  Despite the Commonwealth's pledge not to "limit or alter the rights or powers" "vested in [PREPA]" while its bonds are outstanding, 22 L.P.R.A. § 215, the Act immediately abrogated the Trust Agreement's *ipso facto* clause.  Am. Compl. ¶ 56(d).  The Act also prevents BlueMountain from compelling PREPA to set rates so that it can pay its current expenses and maintain at least 120 percent of upcoming principal and interest payments.  *See id.* ¶ 56(b).  And Section 108(b) of the Act expressly "annuls" BlueMountain's right to seek appointment of a receiver to enforce its rights.  *Id.* ¶ 56(f).  Regardless of whether PREPA ever seeks relief under the Act, the Act "totally eliminat[es] . . . important security provision[s]" in the Trust Agreement and Authority Act.  *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 (1977).  There is nothing "speculative" or "hypothetical" about the Act's nullification of Blue-Mountain's rights. *Ernst & Young*, 45 F.3d at 536.

   Defendants nevertheless claim that BlueMountain's harms are academic because only a default would allow creditors to seek appointment of a receiver.  Mem. 12.  But the Trust Agreement permits bondholders to seek appointment of a receiver in situations other than those in which PREPA fails to make a principal or interest payment—for example, when necessary

8

parts of PREPA's electric system are damaged and not repaired, or when PREPA fails to pay certain judgments within 60 days.  Trust Agreement § 802(d)-(e).

What is more, by giving PREPA the new trump card of invoking the Act's bankruptcy process, the Act "fundamentally weaken[ed]" bondholders' negotiating position.  *Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*, 325 F.3d 879, 883 (7th Cir. 2003).  Indeed, the recent Forbearance Agreement, *see* Mem. 9, demonstrates that the Act already has caused PREPA bondholders to begin negotiating forbearance terms favorable to PREPA.  This injury makes this case fit for judicial resolution.[1]  It is immaterial that "PREPA has not sought to restructure its debts under the Act," *id.*, because these harms already have occurred.[2]

BlueMountain's preemption claims *still* would be ripe even without these immediate harms.  "[T]he raw fact that events have not yet fully unfolded" does not mean that a claim is unripe, especially where, as here, the case "turn[s] on legal issues not likely to be significantly affected by further factual development." *Ernst & Young*, 45 F.3d at 536.  Courts frequently find preemption challenges ripe for this very reason:  Even where it "would be useful to have the benefit" of further factual development, a preemption challenge "need not await that development" to be ripe since it is a "predominantly legal" question.  *Pac. Gas & Elec. Co.*, 461 U.S. at 201-02; *see, e.g., Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92-

---

[1]     *See, e.g., Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (claim ripe where "mere existence of [statute] alters the balance of bargaining power" between parties); *Emp'rs Ass'n, Inc. v. United Steelworkers of Am.*, 32 F.3d 1297, 1299-1300 (8th Cir. 1994) (pre-enforcement challenge ripe where statute "permanently and substantially shift[ed] the terms of bargaining in favor of" one party by altering negotiating "backdrop").

[2]     Defendants insist that the freefall in bond prices that resulted from the Act's enactment is an insufficient injury to satisfy the fitness prong.  Mem. 11-12.  Defendants do not—and cannot, *see Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 417 (3d Cir. 1992)—assert that this injury is too ephemeral to establish standing, which is closely tied to ripeness, *see McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003).  In any event, BlueMountain's other allegations of harm amply satisfy the requirements of Article III.

93 (1st Cir. 2013) ("[b]ecause these challenges rest solely on the existence of the Ordinance, no further factual development is necessary"); *Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1512-13 (9th Cir. 1993) ("[p]reemption is predominantly a legal question, resolution of which would not be aided greatly by development of a more complete factual record").

Indeed, contrary to Defendants' suggestion, Mem. 10, ripeness poses a particularly low bar to a facial challenge, because it does not depend on the specific facts sometimes needed to win an as-applied challenge. *See, e.g., Asociacion de Suscripcion Conjunta del Suguro de Responsabilidad Obligatorio v. Juarbe-Jimenez*, 642 F. Supp. 2d 73, 77-78 (D.P.R. 2009). BlueMountain's preemption claim requires the Court to examine only what the Act's terms authorize and what the Constitution and Bankruptcy Code allow, not what may happen when a debtor seeks relief under the Act. And because "adverseness" is also present—"the facts alleged . . . show that there is a substantial controversy, between parties having adverse legal interests," that allows for "specific relief through a decree of conclusive character, as distinct from an opinion advising what the law would be upon a hypothetical state of facts," *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir. 1994) (citations omitted)—BlueMountain's claims are plainly fit for review.

Defendants' reliance on *Texas v. United States*, 523 U.S. 296 (1998), which involved a request for a declaratory judgment that a Texas statute did not violate the Voting Rights Act, is misplaced. *See* Mem. 9-10. There, the plaintiffs did not allege that the statute was likely to be applied, and, in fact, it would have been triggered only if three contingent events all occurred. 523 U.S. at 300. Here, the Act already has harmed BlueMountain, and BlueMountain indisputably has pleaded that PREPA is likely to invoke the Act and thereby cause BlueMountain addi-

tional harm.  And given the Act's own invocations of PREPA, *see* Act, Statement of Motives § A, BlueMountian's allegation of future additional harm hardly can be dismissed as implausible.

2.  BlueMountain's Contract Clause claims likewise are fit for review.  Upon enactment, the Act stripped BlueMountain of its rights under the Trust Agreement and the Authority Act— including the right to seek appointment of a receiver, the right to find PREPA in default under the *ipso facto* clause, the right to compel PREPA to set rates, and the right to expect that PREPA's rights and powers would not be altered before the PREPA bonds are discharged—and that substantial impairment of BlueMountain's rights was unreasonable and unnecessary.  *See*, *e.g.*, Am. Compl. ¶ 56(b), (d)-(f).  Thus, no "uncertain and contingent events" must occur before BlueMountain suffers injury on its Contract Clause claims.  *Ernst & Young*, 45 F.3d at 536. When a plaintiff claims that a statute lacks a legitimate state purpose "no matter how it is applied"—as BlueMountain has alleged, *see* Am. Compl. ¶¶ 57-73—that claim satisfies the threshold requirement of ripeness.  *Yee v. City of Escondido*, 503 U.S. 519, 533-34 (1992).

3.  BlueMountain's access-to-courts claim also is fit for review.  This is a purely legal claim:  The text of the Act purports to close the federal courthouse doors to bondholders as soon as the Act is invoked.  That the Act has not yet been applied in this way, *see* Mem. 28, is "counterbalanced in [the ripeness] analysis by the fact that [this] case turns on legal issues not likely to be significantly affected by further factual developments."  *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citation and internal quotation marks omitted).

**B.   Withholding Judicial Review Would Cause Additional Hardship.**

BlueMountain's claims also satisfy the second prong of the ripeness inquiry—"the hardship to the parties of withholding court consideration."  *Pac. Gas & Elec. Co.*, 461 U.S. at 201 (citation and internal quotation marks omitted).  Defendants contend that BlueMountain cannot

face hardship under the Act unless and until someone applies for relief under the Act. *See* Mem. 11. That argument fails because, as explained above, BlueMountain need not establish "present injury from a future contemplated event," *McInnis-Misenor*, 319 F.3d at 70, where the Act has already impaired its rights.

Indeed, Defendants' insistence that BlueMountain wait to bring this action until after PREPA invokes the Act is disingenuous. As Defendants know, the Act, once triggered, purports to impose an automatic stay that, on pain of punitive damages, enjoins proceedings in all other courts. Act §§ 304(a), 305. And before that moment, BlueMountain must live with impaired contractual rights and a deeply compromised negotiation position. It thus scarcely can be disputed that deferring adjudication of BlueMountain's claims until PREPA invokes the Act risks additional harms to BlueMountain. *Cf. Stern v. U.S. Dist. Court*, 214 F.3d 4, 11 (1st Cir. 2000) (preapplication challenge ripe where rule would force party to choose between threat of ethics sanctions or jeopardizing success of criminal investigation).

## II.   BlueMountain Adequately Pleaded That The Bankruptcy Code Preempts The Act.

Defendants next contend that the amended complaint should be dismissed because the Act is not preempted by the federal Bankruptcy Code. Mem. 13-21. They are incorrect. The Act is preempted for three independent reasons: (1) it operates in a field that Congress has occupied; (2) it is an obstacle to the Bankruptcy Code's purposes; and (3) it conflicts with the Bankruptcy Code. And BlueMountain has pleaded as much. *See* Am. Compl. ¶¶ 42-54.

### A.   The Act Is Preempted Because It Operates In A Field That Congress Has Comprehensively Occupied.

Congress may "preempt state law" by "occupy[ing]" a particular "field" with federal law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see Telecomms. Regulatory Bd. v. CTIA-The Wireless Ass'n*, 752 F.3d 60, 63 n.3 (1st Cir. 2014) (same for Puerto Rico laws).

Congress preempts all state law in a field "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation" or where the federal interest is "dominant." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). The Constitution expressly empowers Congress to establish "uniform Laws on the subject of Bankruptcies." U.S. Const. art. 1, § 8, cl. 4.

In keeping with these principles, the Supreme Court held in *International Shoe Co. v. Pinkus* that "States may not pass or enforce laws to interfere with or complement the Bankruptcy Acts or to provide additional or auxiliary regulations." 278 U.S. 261, 265 (1929). "The national purpose to establish uniformity *necessarily* excludes state regulation," which would create "intolerable inconsistencies and confusion" if given effect. *Id.* (emphasis added). "[S]tates are [thus] not free to enact laws that interfere with federal bankruptcy law or that provide additional or auxiliary regulation with respect to bankruptcy matters." *In re Bank of New England Corp.*, 364 F.3d 355, 364 (1st Cir. 2004); *see, e.g.*, *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1201 (9th Cir. 2005) ("[F]ederal bankruptcy law . . . involves a federal interest 'so dominant' as to 'preclude enforcement of state laws on the same subject.'"); *In re Boston Reg'l Med. Ctr., Inc.*, 291 F.3d 111, 126 (1st Cir. 2002).

The Act defies these principles. As Defendants do not dispute, the Act "self-consciously operates in the heartland of the Bankruptcy Code by authorizing debt-adjustment without creditor consent" and "confer[ring] on debtors powers and benefits integral to the Bankruptcy Code." Am. Compl. ¶ 45. Indeed, the Act is expressly modeled after the Bankruptcy Code, including Chapters 9 and 11, *see* Act, Statement of Motives § E, and grants both the ability to modify debt obligations without consent and a discharge with the legal force of an injunction, which are the paradigmatic "subject of 'bankruptcies.'" *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188

(1902).  Whatever authority States might retain to enact ***non-bankruptcy*** laws that merely affect

bankruptcy proceedings, this Act impermissibly "provide[s] additional or auxiliary regulation

with respect to bankruptcy matters" and "interfere[s] with federal bankruptcy law." *Bank of New*

*England*, 364 F.3d at 364.

    Defendants' arguments to the contrary are unavailing.

    *First*, Defendants attribute to BlueMountain what they deem the "manifestly incorrect"

claim "that [the Bankruptcy Clause of the U.S. Constitution], by itself, preempts the Act."  Mem.

13; *see id.* at 15.  But that is not what BlueMountain has pleaded.  BlueMountain pleaded that the

Bankruptcy ***Code***, enacted under the authority granted by the Bankruptcy ***Clause***, preempts the

Act.  *See*, *e.g.*, Am. Compl. ¶¶ 44, 47, 48.[3]

    *Second*, Defendants contend that *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316

U.S. 502 (1942), "rejected such a field preemption argument in the context of a state municipal-

restructuring statute."  Mem. 16.  Defendants' reliance on *Faitoute* is sorely misplaced.  In 1942,

*Faitoute* held that a law enacted by Congress some five years earlier had not occupied the field

of municipal bankruptcy.  *See* 316 U.S. at 508.  But Congress ***addressed and effectively over-***

***ruled*** that holding in 1946, by amending the predecessor to 11 U.S.C. § 903 to provide (in terms

nearly identical to those now in force) that, while the federal municipal bankruptcy regime would

continue to respect state control over matters of municipal governance during the bankruptcy

---

[3]    It is Defendants who propound a "fundamental misunderstanding" of state power over
bankruptcy legislation.  Mem. 13.  They contend that "the Bankruptcy Clause does *not* prevent
the States from enacting laws governing the restructuring of debts," and that States did "enac[t]
their own legislation governing restructuring of debts."  *Id.*  But *Sturges v. Crowninshield*, 17
U.S. (4 Wheat.) 122 (1819)—on which Defendants rely—held that the Constitution "restrain[s]"
state power over "bankrupt laws" by "prohibit[ing] the passage of any law impairing the obliga-
tion of contracts."  *Id.* at 199.  Even *Ashton v. Cameron Cnty. Water Improvement Dist.*, 298
U.S. 513 (1936) (cited at Mem. 14), recognized that States may not "impai[r] the Obligation of
Contracts . . . under the form of a bankruptcy act or otherwise."  *Id.* at 531 (citation omitted).
States have never had unfettered authority to enact their own bankruptcy schemes.

process, States could no longer enact their own municipal debt-adjustment laws. *See* Pub. L. No. 481, § 83, 60 Stat. 409, 415 (1946) (amending the Bankruptcy Act of 1898 to prohibit state laws from binding creditors to "composition[s]" to which they do not consent); *see also* H.R. Rep. No. 94-686, at 19 (1946 amendment "was enacted in response to, and overruled the holding of the Supreme Court in *Faitoute*"). Congress did so based on its judgment that a "bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations"— such as the state law in *Faitoute* and like the Act here—"should be uniform throughout" the States. H.R. Rep. No. 79-2246, at 4 (1946). Noting that "the bonds of almost every municipality are widely held," Congress concluded that "[o]nly" under a "uniform" "Federal law should a creditor be forced to accept such an adjustment without his consent." *Id.* Congress inserted the new prohibition against binding compositions immediately after the statutory language that *Faitoute* cited to support its no-preemption holding, further manifesting congressional intent to overrule that holding. *See Faitoute*, 316 U.S. at 508-09 (discussing *United States v. Bekins*, 304 U.S. 27, 50-51 (1938), which in turn discussed statutory language protecting state sovereignty over political and fiscal matters). Defendants' reliance on *Faitoute* thus comes nearly 70 years too late. The Bankruptcy Code now occupies the field of municipal debt adjustment. Because the Act is a municipal debt-adjustment law, it is preempted.

*Third*, Defendants claim that Chapter 9 of the Bankruptcy Code "*does not address* the restructuring of the debts of public agencies or instrumentalities of Puerto Rico." Mem. 17 (emphasis in original); *see also id.* at 16-18. But Congress did not fail to address whether Puerto Rico municipalities could participate in Chapter 9 proceedings; it specifically *included* Puerto Rico in the definition of the word "State" for most purposes, but deliberately *excluded* Puerto Rico from the definition "for the purpose of defining who may be a debtor under chapter 9," 11 U.S.C.

§ 101(52), which, in turn, precludes Puerto Rico municipalities from participating in Chapter 9 debt restructuring, *see id.* §§ 101(40), 109(c)(1); *see also* Mem. 16-17 (agreeing that Puerto Rico's public entities may not participate in Chapter 9 proceedings).

Defendants say that it would be "anomalous" to read Congress's decision to preclude Puerto Rico's municipalities from participating in Chapter 9 proceedings as "consign[ing]" them to a "twilight zone where [they] cannot restructure [their] debts." Mem. 17-18.  But Puerto Rico's municipalities are not remotely unique in their current inability to restructure their debts. *All* municipalities must be "specifically authorized . . . to be a debtor under [Chapter 9] by" state law or an authorized state officer or organization.  11 U.S.C. § 109(c)(2).  And even though all States *may* permit their municipalities to participate in Chapter 9 proceedings, "[o]nly about half the states" do so.  William Selway & Derek Wallbank, *Puerto Rico Municipal Bankruptcy Proposed in U.S. House Bill*, Bloomberg (July 31, 2014), *available at* http://www.bloomberg.com/news/2014-07-31/puerto-rico-municipal-bankruptcies-proposed-in-u-s-house-bill.html ("*Puerto Rico Municipal Bankruptcy Proposed*").  Puerto Rico, of course, is not under the control of any State, but rather is under the control of the federal government. Congress's decision not to permit Puerto Rico municipalities to be debtors under Chapter 9 thus reflects its considered policy judgment to retain control over any restructuring of their debts, just as many States have done with their own municipalities.  In fact, Congress reached the identical conclusion for the District of Columbia.  *See* 11 U.S.C. § 101(52).  And it is to Congress that Puerto Rico (or the District of Columbia) must turn if it wishes to restructure its debts or those of its instrumentalities.  Indeed, Puerto Rico's delegate to the House of Representatives already has moved in that direction, proposing legislation that would enable Puerto Rico to authorize its pub-

16

lic entities to "utilize the tried-and-true Chapter 9 procedure." *Puerto Rico Municipal Bankruptcy Proposed*.

Defendants may question the wisdom of Congress's judgment, but they may not override it:  Congress's exclusion of Puerto Rico is not a "gap" to be "fill[ed]" by a bankruptcy statute of the Commonwealth's creation.  Mem. 18.  Rather it is a policy judgment that any restructuring of Puerto Rico's public debts should be controlled by Congress.

*Fourth*, Defendants contend that courts have "long upheld the application of state restructuring or liquidation proceedings to entities, such as banks and insurance companies, that are specifically excluded from other provisions of the federal Bankruptcy Code."  Mem. 17.  But banking and insurance hold materially different places under federal law than does municipal debt restructuring.  The issuance of insurance policies was long understood not even to involve "a transaction in interstate commerce," and States thus "enjoyed a virtually exclusive domain over the insurance industry."  *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 538-39 (1978).  When a 1944 Supreme Court decision changed that understanding, Congress swiftly cabined its effects by enacting the McCarran-Ferguson Act.  *Id.* at 539; *see* 15 U.S.C. § 1012 (preserving state authority over "the business of insurance").  The Bankruptcy Code exemption for insurance companies is a manifestation of this same congressional policy of "reverse preemption."[4]  Congress has similarly acted to permit States to regulate banks.  *See, e.g.*, 12 U.S.C. § 25b (state consumer finance laws); *id.* § 1465 (savings associations).  Indeed, *In re Israel-*

---

[4]     *See Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 595 (5th Cir. 1998) ("Congress has evinced a strong federal policy in favor of deferring to state regulation of insolvent insurance companies . . . [including] the express exclusion of insurance companies from the federal Bankruptcy Code."); *cf. Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1035 (7th Cir. 2014) ("[E]ven ERISA, which may contain the broadest preemption clause of any federal statute and completely occupies the field of employees' health and welfare benefits, has an exception for insurance, which it leaves to state law." (citations omitted)).

*British Bank (London) Ltd.*, on which Defendants rely, *see* Mem. 18, confirms that "banks incorporated under state law" were carved out from the Bankruptcy Code because "considerations of federalism required that the states be allowed to liquidate as well as to regulate their own creations."  536 F.2d 509, 514 (2d Cir. 1976).  In short, state debt-restructuring regimes for banks and insurance companies are not a *response to* Congress's exclusion of such entities from the Bankruptcy Code; Congress affirmatively excluded banking and insurance companies from the Code as part of a broader decision *to enable* continued state regulation of these specific industries.  By contrast, Congress halted state municipal debt-restructuring laws altogether in 1946, choosing instead to establish one uniform federal law governing municipal restructuring.

*Fifth*, Defendants assert that a preemption holding would raise "serious constitutional concerns" about the "uniform[ity]" of the Bankruptcy Code.  Mem. 19.  But excluding Puerto Rico and the District of Columbia from Chapter 9 presents no uniformity concern.  "The uniformity requirement is not a straitjacket that forbids Congress to distinguish among classes of debtors," *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 469 (1982), and "[i]t is beyond hope of contradiction" that Congress may "treat Puerto Rico differently from the states," *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 322 (1st Cir. 2012).  In Section 109, Congress gave States the power to authorize the debt restructuring of the municipalities under their jurisdiction, and in Section 101(52) Congress retained for itself control over the debt restructuring of the municipalities under its jurisdiction.  Puerto Rico's different treatment under the Code simply reflects the fact that it is not a State and remains under Congress's control and supervision.

*Sixth*, Defendants urge this Court to "construe the [Bankruptcy] Code in a way that preserves, not negates, the exercise of Puerto Rico's sovereign police power."  Mem. 21.  This too is unavailing.  To begin, the presumption of state sovereignty that Defendants invoke does not ap-

ply because Puerto Rico's relationship with the federal government does not implicate the federalism concerns that arise with States.  *See Antilles Cement Corp.*, 670 F.3d at 322.  Moreover, the Supreme Court has made clear that the presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence."  *United States v. Locke*, 529 U.S. 89, 108 (2000).  To say that "there has been a significant federal presence" in bankruptcy law generally and municipal bankruptcy law specifically would be an understatement.  *See Bekins*, 304 U.S. 27 (affirming constitutionality of 1937 municipal bankruptcy law).  The presumption against preemption does not apply here.  *Cf. PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 471, 477 (4th Cir. 2014) (presumption against preemption "almost certainly inapplicable" where federal government's regulatory authority dated back to 1930s, even though "extensive local regulation" had preceded federal regime).  And even if it did, it would not "constrai[n]" a court to reject preemption.  Mem. 21.  It would be only a presumption subject to rebuttal; and the case for preemption here is overwhelming.[5]

### B.    The Act Is Preempted Because It Is An Obstacle To The Accomplishment And Execution Of Congress's Full Purposes And Objectives.

Even where Congress has not fully occupied a field, a state law is preempted when it "stands as an obstacle to the accomplishment and execution of the full objectives of Congress."  *Antilles Cement Corp.*, 670 F.3d at 323-24.  As BlueMountain has alleged, the Act is preempted because it undermines the Bankruptcy Code's purposes.  Am. Compl. ¶ 47.

---

[5]    Defendants also argue that the Act "does not provide for a discharge of any creditor's claim," suggesting that the Act does not implicate preemption concerns for the Bankruptcy Code. Mem. 6.  That argument contradicts BlueMountain's allegation that the Act "purports to confer on debtors powers and benefits integral to the Bankruptcy Code," including "a discharge with the legal force of an injunction."  Am. Compl. ¶ 45 (citing Act § 115(b)(2), (c)(3)).  Defendants are not entitled to contradict BlueMountain's allegation at this stage.  In any event, Defendants do not contest that the Act purports to enable debtors to force creditors to accept only partial satisfaction of their claims without redress—effectively providing debtors a discharge.

Defendants do not meaningfully dispute that the Act stands as an obstacle to the accomplishment and execution of Congress's full purposes and objectives. *See*, *e.g.*, Mem. 19 (transitioning directly from field preemption to conflict preemption). Nor could they: As explained already, Congress enacted Chapter 9 of the Bankruptcy Code to ensure that the "bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations . . . [would] be uniform throughout" the nation. H.R. Rep. No. 79-2246, at 4 (1946). The Act's very enactment is an obstacle to achieving a uniform bankruptcy law. The Act purports to establish its own bankruptcy court and contains other provisions that supplement or differ from their Bankruptcy Code counterparts. *See* Am. Compl. ¶¶ 20-37, 44-54. The existence of a separate system in Puerto Rico to adjust public corporations' debt undermines the federal standards governing identical circumstances. *Id.* ¶ 47. Particularly given Congress's decision to exclude Puerto Rico municipalities from being debtors under the Bankruptcy Code, *see supra* at 15-16, Congress manifestly intended to preempt "state action for the discharge of insolvent debtors"—such as the Act. *Pinkus*, 278 U.S. at 265.

## C.    The Act Is Preempted Because It Conflicts With The Bankruptcy Code.

The Act is also preempted "to the extent of actual conflict with the [federal] system." *Chi. Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.*, 302 U.S. 120, 126 (1937). BlueMountain's complaint sets forth three examples of conflict, none of which has been rebutted. *See* Am. Compl. ¶ 15.

*First*, the Act conflicts with the Bankruptcy Code's prohibition against state laws prescribing for municipalities a "'method of composition of indebtedness'" that binds nonconsenting creditors. Am. Compl. ¶ 49 (quoting 11 U.S.C. § 903(1)). "State" includes Puerto Rico for the purpose of determining what constitutes a "State law" under Section 903. *See* 11 U.S.C. § 101(52). As explained, *see supra* Part II-A, Section 903 confirms that "the Bankruptcy

Code—and only the Bankruptcy Code—governs the adjustment or discharge of a municipality's debts." Am. Compl. ¶ 49.  Despite this clear command, the Act allows a dissenting creditor to be forced to accept a modification of its debt instrument.  *See id.* ¶¶ 49-50.

Defendants contend that Section 903 does not apply because it only "addresses the impact of 'this chapter'—*i.e.*, Chapter 9—on States' authority to regulate the debt restructuring of their own agencies and instrumentalities."  Mem. 19-20 (quoting 11 U.S.C. § 903) (alterations omitted).  They contend that because Puerto Rico municipalities are not permitted to participate in Chapter 9 bankruptcy proceedings, Chapter 9 "does not apply," and "it follows that Section 903 does not apply either."  *Id.* at 20.  Defendants misread Section 903, which first clarifies that Chapter 9 "does not limit or impair the power of a State" to exercise political and fiscal authority over "a municipality of or in such State," 11 U.S.C. § 903, then qualifies that statement by prohibiting state laws from binding non-consenting creditors to a composition of indebtedness of a municipality, and prohibiting judgments entered under such laws from binding non-consenting creditors.  *Id.* § 903(1)-(2).  This prohibition against state bankruptcy laws is the prohibition Congress inserted in 1946 to overrule *Faitoute*, and its "plain language" is intentionally "not limited to bankruptcy proceedings."  *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 431 (6th Cir. 2014) (en banc).  Indeed, if Defendants were correct that Section 903's prohibition against state bankruptcy laws applied only in the context of Chapter 9 cases, then that prohibition would accomplish nothing because the municipal debtor would already have invoked federal bankruptcy law.  Section 103 of the Bankruptcy Code (cited at Mem. 20) confirms this conclusion:  Whereas many of Section 103's provisions limit certain chapters or subparts of a chapter to apply "only in a case under such chapter," *see, e.g.*, 11 U.S.C. § 103(b)-(e), (g)-(k), Congress did *not* so limit Chapter 9.  *See id.* § 103(f).

Defendants also suggest that Section 903(1)'s prohibition does not apply to Puerto Rico because Section 903(1) precludes only laws that concern the relationship between "creditors" and debtor municipalities, and that because Puerto Rico municipalities cannot be Chapter 9 "debtors," PREPA bondholders are not "creditors" within the meaning of the Bankruptcy Code. Mem. 20 (quoting 11 U.S.C. § 101(10)).  But when the prohibition was enacted in 1946, the term "creditor" simply meant "the holder of a security or securities"; the definition did not depend on the presence of a debtor invoking federal bankruptcy law.  60 Stat. at 410.  When Congress retained the prohibition in 1978, it noted that it intended only "stylistic" changes, not substantive ones, and also intended to continue preventing States from enacting their own municipal debt-restructuring statutes.  S. Rep. No. 95-989, at 110 (1978).  Moreover, almost half the States bar their municipalities from being Chapter 9 debtors, *see supra* at 16; Defendants' reading would enable each of these States to "opt out" of Section 903 and enact bankruptcy laws for their own municipalities—eviscerating the uniform solution Congress sought to achieve in overruling *Faitoute*.  Section 903 avoids these untenable results by applying its prohibition to all "State law[s] prescribing a method of composition of indebtedness of [a] municipality" (including those of Puerto Rico)—regardless of whether the State permits its municipalities to be Chapter 9 debtors or whether a Chapter 9 proceeding is pending.

*Second*, Section 322(c) of the Act permits a debtor to obtain credit "secured by a senior or equal lien on the [debtor's] property" even though the same property is already "'subject to a [previous] lien'"—and to do so without any protection for such a previous lien—if, among other things, "'the proceeds are needed to perform public functions.'"  Am. Compl. ¶ 51.  Defendants do not meaningfully dispute that this contradicts 11 U.S.C. § 364(d)(1), which requires adequate protection for existing liens.  *See* Am. Compl. ¶ 52.  Defendants contend that "there can be

no . . . 'conflict' where, as here, an agency or instrumentality of Puerto Rico is not entitled to file for protection under the federal Bankruptcy Code in the first place."  Mem. 21.  But Congress's decision to preclude Puerto Rico's public entities from restructuring their debts under Chapter 9 represents a decision to preclude them from restructuring their debts under ***both*** *federal **and** state law*.  *See supra* Part II-A.

*Third*, as discussed already, *see supra* Part II-A, the Act's very existence conflicts with Congress's decision to withhold from Puerto Rico the ability to participate in a bankruptcy regime without further action from Congress.  *See* Am. Compl. ¶ 53.  Defendants argue that "there can be no such 'conflict' where, as here, an agency or instrumentality of Puerto Rico is not entitled to file for protection under the federal Bankruptcy Code in the first place."  Mem. 21.  That is unavailing.  Congress withheld from Puerto Rico the ability to participate in a bankruptcy scheme; the Act provides to the contrary; the Act is therefore preempted.  *See supra* Part II-A.

## III.   BlueMountain Adequately Pleaded That The Act Violates The Contract Clauses.

The Act violates the Contract Clauses of the U.S. and Puerto Rico Constitutions if it substantially impairs contract rights and is not reasonable or necessary to serve an important government purpose.  *See U.S. Trust Co. of N.Y.*, 431 U.S. at 25; *UAW v. Fortuño*, 633 F.3d 37, 41-43 (1st Cir. 2011); *Bayrón Toro v. Serra*, 19 P.R. Offic. Trans. 646, 661-62 (P.R. 1987).  BlueMountain has adequately alleged that the Act violates those clauses.

### A.   The Act Substantially Impairs Contractual Rights.

BlueMountain adequately alleged that the Act substantially impairs contractual rights.  BlueMountain alleged that the Act has already stripped bondholders of the right to appointment of a receiver.  *See* Am. Compl. ¶ 56(f).  BlueMountain also alleged—and Defendants do not contest—that the Act abrogates the Trust Agreement's *ipso facto* clause providing that PREPA is deemed in default if it cannot fulfill its obligations, a proceeding is instituted to restructure its

debts, or an order or decree is entered for the purpose of restructuring its debts.  *See id.* ¶ 56(d).
And BlueMountain alleged that the Act violates the Commonwealth's pledge that it would not
"limit or alter the rights or powers" "vested in [PREPA] until all such bonds at any time issued,
together with any interest thereon, are fully met and discharged,  22 L.P.R.A. § 215.  *See* Am.
Compl. ¶ 56(e).  This is an independent contractual violation, cognizable even if PREPA never
exercises its new rights under the Act.  *See id.*; *Patterson v. Carey*, 52 A.D.2d 171, 175 (N.Y.
App. Div. 1976) (State's refusal to honor pledge to raise revenues to pay bondholders violates
Contract Clause).  Because these allegations affect PREPA bondholders' contract rights equally,
rather than depending on the manner in which the Act's bankruptcy process plays out when ap-
plied, BlueMountain has adequately stated a facial challenge under the Contract Clause.[6]

Defendants contend that BlueMountain has not suffered any substantial impairment of its
contract rights "because the Act has never been invoked" and "[t]here is simply no way to know
whether a contract will be impaired at all—much less 'substantially' impaired—unless and until
the Act is invoked."  Mem. 23.  These arguments—which are simply repackaged ripeness argu-
ments—ignore BlueMountain's allegations that the Act already has caused harm:  The Act, of its

---

[6]    To succeed on its facial challenge, BlueMountain need show only that the Act lacks a
"plainly legitimate sweep," not, as Defendants would have it, that "the Act cannot constitutional-
ly be applied . . . to *any* contracts."  Mem. 23; *see, e.g.*, *McCullen v. Coakley*, 571 F.3d 167, 174
(1st Cir. 2009) ("plainly legitimate sweep" test "is a refinement of [the Supreme Court's] earlier
statement that a party mounting a facial challenge 'must establish that no set of circumstances
exists under which the Act would be valid'" (citation omitted)).  BlueMountain has alleged that
the Act substantially and unreasonably impairs the contracts of a broad swath of bondholders,
and thus that it lacks a legitimate sweep.  Moreover, the Court need not "speculat[e]" whether
the Act might be "implemented in a manner consistent with the Constitution," *Wash. State Grange v.
Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008), because BlueMountain has alleged
that the Act's very enactment has impaired contractual rights in a manner incompatible with the
Constitution.  BlueMountain's Contract Clause allegations therefore satisfy the "plainly legiti-
mate sweep" test.  But even if this Court concluded otherwise, BlueMountain still would have a
live as-applied challenge against the Act's impairment of ***its*** contractual rights.  *See* Am. Compl.
¶ 83 (seeking relief from "the Act in its entirety, and any prospective enforcement").

own force, has "totally eliminated . . . important security provision[s] and thus impaired the obligation" of the Trust Agreement and Authority Act.  *U.S. Trust Co. of N.Y.*, 431 U.S. at 19.

Citing *Segal v. Rochelle*, 382 U.S. 375, 379 (1966), Defendants also contend that the Act does not substantially impair contract rights because "a key feature of any restructuring law is to provide creditors in the aggregate with *more* value than they would receive if they simultaneously sought to enforce their claims."  Mem. 24.  Yet *Segal* holds only that the *federal* Bankruptcy Code's "main thrust" is to "secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition."  382 U.S. at 379.  It does not establish how the Act may operate, and does not rebut BlueMountain's allegations of harm.

More fundamentally, by emphasizing what BlueMountain might realistically be able to recover if it sought to collect on the PREPA bonds at the same time as every other bondholder, Mem. 23-24, Defendants' argument conflates *contractual rights* with the *ability to enforce* a contract.  The law is settled, however, that parties have a reasonable expectation to the value of the contract.  Restatement (Second) of Contracts § 344.  As a result, courts should consider the parties' reasonable expectations when the contract was signed when judging Contract Clause claims, not what one party can pay at any given moment.  *See*, *e.g.*, *Mercado-Boneta v. Administración del Fondo de Compensación al Paciente*, 125 F.3d 9, 13 (1st Cir. 1997) (emphasizing the "important role" "in Contract Clause analysis" of "the expectations of the parties").  Defendants' logic would allow the government to rip up contracts when performance becomes inconvenient without being deemed to have caused a substantial impairment.  The Contract Clauses do not allow such a result.[7]

---

[7]     Defendants also cite *Faitoute*'s Contract Clause holding for the proposition that the Act does not impair contract rights.  Whatever continuing relevance *Faitoute*'s holding may have, *see U.S. Trust Co. of N.Y.*, 431 U.S. at 27 (warning that *Faitoute* is "[t]he only time in this centu-

## B.     The Act Is Not Reasonable Or Necessary.

BlueMountain also adequately pleaded that the Act is not reasonable or necessary to serve important government interests.  Defendants do not respond to most of these allegations.

*First*, Defendants ignore BlueMountain's allegation that the Act advances special interests over certain creditors and is therefore unreasonable.  Am. Compl. ¶ 66.  The Act requires PREPA to pay certain, preferred debts "to the maximum extent possible."  Act § 327; Am. Compl. ¶ 66.  The Act also advances the interests of Puerto Rico municipalities at the expense of PREPA's creditors by failing to address contributions in lieu of taxes and other subsidies.  *See* Am. Compl. ¶¶ 67-68.  And by eliminating GDB and Treasury financing as an option to cover operating deficits, the Act effectively forces creditors to pay for the Commonwealth's own financial mismanagement of its municipalities.  *See id.* ¶ 68.

*Second*, and as Defendants also do not address, BlueMountain alleged that the Act is unreasonable in light of the reliance interests at issue.  *See* Am. Compl. ¶ 69.  In addition to the Trust Agreement's contractual terms, BlueMountain relied on additional pledges, including the Commonwealth's pledge that "it w[ould] not limit or alter the rights or powers" "vested in [PREPA] until all such bonds at any time issued, together with interest thereon, are fully met and discharged," 22 L.P.R.A. § 215, and that a receivership remedy would be available if PREPA defaulted, *id.* §§ 207, 208.  The Act repudiates those pledges.

---

ry that alteration of a municipal bond contract has been sustained by this Court"), it does not support upholding the Act.  The state statute in *Faitoute* permitted a local government to be placed into receivership by a state agency, and the ensuing composition affected only the maturity date and interest rates of unsecured bonds, 316 U.S. at 505-07, 509.  The proceedings at issue occurred when federal municipal bankruptcy law was in flux and not an option for the debtor. *See id.* at 507-08.  Here, by contrast, the Act contradicts long-settled bankruptcy law by eliminating, for secured bonds, protections provided in the Trust Agreement and Authority Act, and it has caused the value of the bonds to plummet.  *Faitoute* does not bless such severe impairments.

*Third*, BlueMountain alleged that the Act is not necessary as a *bona fide* emergency measure because the (apparently permanent) Act is not limited to the purported emergency to which it responds.  *See* Am. Compl. ¶ 72.  The Act would "allow a public entity to participate in the bankruptcy regime it establishes irrespective of whether an 'emergency' actually exists."  *Id.* Defendants also do not respond to these allegations.

*Fourth*, BlueMountain alleged that the Act is not reasonable because of the numerous more moderate options the Commonwealth had available.  *See* Am. Compl. ¶¶ 57-64.  By moderately increasing rates, PREPA could have covered many costs—including bond payments.  *See id.* ¶ 59.  PREPA could have collected outstanding payments due to it from the Commonwealth and other municipal entities.  *See id.* ¶ 60.  It could have engaged markets and investors, and applied for a federal guarantee.  *See id.* ¶ 61.  It could have cut costs.  *See id.* ¶ 62.  Or it could have attempted voluntary renegotiation with creditors.  *See id.* ¶ 63.  The Act, however, was passed without attempting any of these measures, which may have enabled PREPA and others to improve their financial conditions without the Act's draconian measures.  *See id.* ¶¶ 64-65.

Defendants acknowledge this fourth group of allegations, but argue that BlueMountain has not suffered injury because the Act has not yet been invoked.  *See* Mem. 25-26.  Those arguments are unavailing at this stage, when BlueMountain's allegations of already inflicted harm are accepted as true.  *Cook v. Gates*, 528 F.3d 42, 48 (1st Cir. 2008).  Defendants also urge that the Commonwealth should be afforded deference on its judgment that a measure is necessary and reasonable.  *See* Mem. 24.  But that deference cannot overcome BlueMountain's well-pleaded allegations that the Commonwealth acted unnecessarily and unreasonably.  And although the Commonwealth might enjoy some deference, that deference is limited, *U.S. Trust Co. of N.Y.*,

27

431 U.S. at 25-26, and is especially weak here because the Commonwealth has "alter[ed] its own contractual obligations," *Fortuño*, 633 F.3d at 43.

Defendants also invoke *Mercado-Boneta*; *Veix v. Sixth Ward Building & Loan Ass'n of Newark*, 310 U.S. 32, 37 (1940); and *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444-47 (1934), to emphasize the purported difficulty of prevailing on a Contract Clause claim. *See* Mem. 24-25. *Mercado-Boneta* involved materially weaker allegations than those here: The court held that the law at issue did not lessen Puerto Rico's own financial obligations "at all" and "did not impose 'a drastic impairment when an evident and more moderate course would serve its purposes equally well.'" 125 F.3d at 16, 17 (quoting *U.S. Trust Co. of N.Y.*, 431 U.S. at 31). The law in *Blaisdell* was carefully limited in scope and was only temporary—unlike the Act here. 290 U.S. at 445-47. And *Veix* did not even test the sufficiency of allegations that the State could have achieved its purported interests through less severe methods, and thus has nothing to say about the reasonableness or necessity of the Act here. 310 U.S. at 41.

And far from undermining BlueMountain's allegations, *see* Mem. 24-25, *Fortuño* out-lines precisely what a party must allege to plead a Contract Clause claim, and BlueMountain's amended complaint tracks each step of its analysis. The plaintiffs in *Fortuño* "failed to suffi-ciently describe the contractual provisions allegedly impaired" by the Act, 633 F.3d at 46, but Defendants do not even try to argue that BlueMountain's amended complaint suffers from a sim-ilar flaw. *See* Am. Compl. ¶¶ 55-56. The amended complaint provides detailed allegations ex-plaining *why* the Act is unreasonable and unnecessary, *id.* ¶¶ 57-64, far beyond the *Fortuño* plaintiffs' bare assertion that "'the averred purpose is neither sufficient nor legitimate,'" 633 F.3d at 46. Similarly, BlueMountain has alleged both that the Act "was an excessively drastic

means of tackling the deficit" *and* that it "was enacted to benefit a special interest at the expense of" rights holders, *id.* at 47.  *See* Am. Compl. ¶¶ 57-68.

## IV.  BlueMountain Adequately Pleaded That The Act Impermissibly Denies Access To Federal Courts.

BlueMountain plausibly alleged that the Act tramples the right of access to federal court.  *See* Am. Compl. ¶¶ 76-77.  Aside from *in rem* actions—actions in which the court exercises jurisdiction over property rather than over a person or entity—"state courts are completely without power to restrain federal-court proceedings."  *Donovan v. City of Dallas*, 377 U.S. 408, 413 (1964).  This rule derives from the Constitution's Supremacy Clause.  *See, e.g., Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 695 (1979) ("State-law prohibition against compliance with the District Court's decree cannot survive the command of the Supremacy Clause of the United States Constitution.").  The Act's suspension and automatic-stay provisions violate this rule by blocking access to federal courts.  *See* Am. Compl. ¶ 77.

Defendants argue that the Act is valid because bankruptcy proceedings fall under the rule's *in rem* exception.  Mem. 28-29.  Not so.  The *in rem* exception recognizes that where one court "has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought," the other court must "yield to" the jurisdiction of the first.  *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939).  But the Act's suspension and automatic-stay provisions do not merely attempt to coordinate competing jurisdictional claims over a single piece of property.  The suspension provision, for example, provides that "no entity asserting claims or other rights . . . in respect of affected debt instruments . . . may exercise or continue to exercise *any remedy* under contract or applicable law."  Act § 205 (emphasis added).  The provision thus prohibits affected creditors or the Trustee

29

from seeking "any remedy under" "applicable law," including constitutional challenges to the Act itself—far beyond the realm of *in rem* actions.

Similarly, filing a petition under the Act automatically stays "the commencement or continuation" in any court of any action against the petitioner—or *any* "enumerated entity," including the GDB and the Commonwealth itself—that "was or could have been commenced before the filing of a petition under chapter 3 of th[e] Act." Act §§ 102(32), 304, 305. This provision, again, goes far beyond blocking *in rem* proceedings, by, for example, barring contract or tort claims against the Commonwealth, even though such claims give rise to *in personam* proceedings. *See, e.g., Bluetarp Fin., Inc. v. Matrix Constr. Co.*, 709 F.3d 72, 76-77, 79-83 (1st Cir. 2013) (determining whether personal jurisdiction exists in contract case); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 412, 413-18 (1984) (same in tort context). BlueMountain adequately stated a claim for denial of access to federal courts.

## CONCLUSION

The motion to dismiss should be denied.[8]

---

[8]   Defendants briefly suggest that BlueMountain has not yet "shown" that it is entitled to injunctive relief, Mem. 29-30, but this undeveloped argument is premature. BlueMountain has not yet *moved* for injunctive relief; it is opposing Defendants' motion to dismiss.

Dated:   San Juan, Puerto Rico

      October  6, 2014                       INDIANO & WILLIAMS, PSC


By:  /s/ David C. Indiano
      DAVID C. INDIANO
      JEFFREY M. WILLIAMS
      LETICIA CASALDUC-RABELL
      USDC-PR Nos. 200601, 202414, 123513
      207 Del Parque St., 3d Floor
      San Juan, P.R.  00912
      Telephone:   787.641.4545
      Facsimile:   787.641.4544
      E-mail:  david.indiano@indianowilliams.com
             jeffrey.williams@indianowilliams.com
             leticia.casalduc@indianowilliams.com


      – and –

      GIBSON, DUNN & CRUTCHER LLP


By:  /s/ Theodore B. Olson
      THEODORE B. OLSON
      MATTHEW D. MCGILL
      MATTHEW J. WILLIAMS
      SCOTT G. STEWART
      1050 Connecticut Avenue, N.W.
      Washington, D.C.  20036
      Telephone:   202.955.8500
      Facsimile:   202.467.0539
      E-mail: tolson@gibsondunn.com

      *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 6, 2014, I electronically filed this Memorandum of Law in Opposition to Defendants' Motion to Dismiss with the Clerk for the United States District Court for the District of Puerto Rico using the Court's CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Respectfully submitted,

Dated:  October 6, 2014

/s/ David C. Indiano
_____
DAVID C. INDIANO
INDIANO & WILLIAMS, PSC
USDC-PR No. 200601
207 Del Parque St., 3d Floor
San Juan, P.R.  00912
Telephone:    787.641.4545
Facsimile:     787.641.4544
E-mail:  david.indiano@indianowilliams.com